[No. 14165-5-II.    Division Two.    May 19, 1993.]

THE STATE OF WASHINGTON, *Respondent,* v. HERBERT PACHECO, *Appellant.*

---

*Peter A. Camiel* and *Mair, Abercrombie, Camiel & Rummonds,* for appellant (appointed counsel for appeal).

*Arthur D. Curtis, Prosecuting Attorney,* and *Richard A. Melnick, Deputy,* for respondent.

ALEXANDER, C.J. — Herbert Pacheco appeals his convictions for conspiracy to commit first degree murder, two counts of attempted delivery of a controlled substance and two counts of conspiracy to deliver a controlled substance. He contends that the trial court erred in denying his motions: (1) to dismiss charges of conspiracy to commit first degree murder and conspiracy to deliver a controlled substance; (2) to exclude audiotapes made as part of an investigation conducted by the Clark County Sheriff; (3) to exclude the testimony of a police informant; and (4) to dismiss all charges based on the State's failure to preserve evidence. He also asserts that "[i]t was error for the prosecuting attorney to cross examine the defendant before the jury regarding the pretrial motion to suppress tape recordings"; that he received ineffective assistance of counsel; that the trial court erred in instructing the jury that the substantial step required to prove criminal conspiracy could be taken by any one of the conspirators, including an undercover police officer; that there was insufficient evidence to support his convictions on both counts of attempted delivery of a controlled substance; and that the trial court erred in determining the standard range sentence on Pacheco's convictions for conspiracy to deliver a controlled substance. We affirm all of Pacheco's convictions; however, we reverse the sentences on the two counts of conspiracy to deliver a controlled substance and we remand for resentencing on those counts.

In 1990, Herbert L. Pacheco was charged in Clark County Superior Court with conspiracy to commit murder in the first degree (count 1), attempted murder in the first degree (count 2), two counts of unlawful delivery of a controlled substance (counts 3 and 4), two counts of conspiracy to deliver a controlled substance under RCW 69.50.407 (counts 5 and 6), and official misconduct (count 7). Counts 3 and 4 were later

amended to charge attempted delivery of a controlled substance.

Before trial, Pacheco moved to suppress the testimony of Thomas Shane Dillon, a paid informant, and recordings of conversations that occurred between Dillon and Pacheco. Two of the recordings were made pursuant to an FBI investigation, and these "federal" recordings were used to establish probable cause for subsequent recordings made by the Clark County Sheriff's office. The trial court denied Pacheco's motion to exclude Dillon's testimony and/or suppress the recordings made by the sheriff's office, ruling that the recordings made by the sheriff's office could be introduced but the federal recordings were inadmissible. Following that ruling, the parties stipulated that the federal recordings could be admitted.

Dillon testified at trial that he met Pacheco in 1985 when Pacheco took a job working at Dillon's private investigation firm. Dillon testified that during the 2 months they worked together, Pacheco bragged about his drug connections and his ability to supply automatic weapons.

In 1988, Dillon attempted to contact Pacheco and "was in shock" to discover that Pacheco was working as a deputy in the Clark County Sheriff's office. Dillon went to the Federal Drug Enforcement Administration (DEA) and volunteered to inform on Pacheco. The DEA declined his request.

In 1989, Dillon contacted the FBI and informed it that Pacheco would provide him with automatic weapons or drugs upon request. Although Dillon admitted that he had never actually witnessed Pacheco do any of the things Pacheco said he could do, he testified that he based his assertions to the FBI on what Pacheco had told him years before.

FBI Special Agent Sanders began an investigation of Pacheco in November of 1989, instructing Dillon to contact Pacheco while wearing a device that would record any conversations the two men might have. Dillon, in return, was to be paid $20 per hour and 25 cents per mile, plus documented expenses. In December 1989, Sanders told the Clark

County Sheriff's office that the FBI was investigating one of its deputies, and the sheriff's office assigned a deputy to assist the FBI. The Clark County Superior Court authorized Clark County officers to intercept and record Dillon's conversations with Pacheco. Probable cause for those recordings was established by earlier recordings of conversations between Pacheco and Dillon, which had been made as a part of the federal investigation.

On or about January 8, 1990, Pacheco and Dillon met on three occasions and talked about doing various "deals", including doing "collections" and running information checks on various people. Dillon told Pacheco that he was working for the "mafia" in Seattle, who might be interested in employing Pacheco.

On February 1, 1990, Dillon and Pacheco met at Diamond Jim's Restaurant in Vancouver, Washington, and Dillon voiced a need for protection in a future drug transaction. In mid-February 1990, the investigation was taken over by the Clark County Sheriff's office, with the FBI assisting.

On March 26, 1990, Dillon requested another meeting at Diamond Jim's. Upon his arrival, Dillon took Pacheco outside to the parking lot where Dillon's car was parked, opened the trunk, took out a suitcase, and showed Pacheco what he described as "coke". Dillon told Pacheco that a "buyer" (FBI undercover agent Parker) would arrive in about an hour, and that Pacheco should come back then to "protect" Dillon during the transaction.

Pacheco testified that he went to a local store to call 911, but changed his mind because he thought that he "was being tested" by Dillon. Consequently, he returned to Diamond Jim's, and attempted to record the license plate of the "buyer's" car. He was unable to do so. Dillon tried to offer Pacheco money for his services at that time, but Pacheco refused to accept it.

Pacheco testified that he met Dillon later that evening and asked him if the "deal" had happened. Dillon said that the drug had been sold and showed Pacheco an envelope

allegedly containing $16,000. Dillon then paid Pacheco $500 for the "protection" he had provided. Pacheco claimed at trial that he did not report what had happened to his superiors because he had not actually seen a drug transaction, and that the envelope which allegedly contained $16,000 was too small to contain that much money. At trial, the State failed to produce the envelope, indicating it had been destroyed. Pacheco moved to dismiss all charges due to the State's failure to preserve evidence. The motion was denied.

Pacheco said he decided to keep the $500 that he had received from Dillon until he had gathered enough information to make a case. Pacheco, however, gave a portion of the money to his son, replacing it later with money from his own savings account. At Dillon's request, he also ran a person's name through the computer system of Multnomah County, and confirmed that the person had no criminal history. Pacheco also testified that Dillon had asked him to check on two other persons, but that he did not make the checks, simply reporting to Dillon that neither person had a criminal history.

Later that week, Pacheco again met Dillon at Diamond Jim's, where a larger drug transaction was supposed to take place. Agent Parker again posed as a buyer, but Pacheco claimed that he did not see any transaction occur. Pacheco testified that he thought he was still being tested by Dillon because Dillon did not count the money, the envelope looked too small to contain $50,000, and Dillon refused to let him set up future transactions. Pacheco received another $500 from Dillon, and put that money with the other money he had received. He testified that he did not believe that the money had any evidentiary value to the police at that time, and that he believed he was following proper police policies and procedures.

Later that same night, Dillon called Pacheco and told him that the "buyer" had "shorted" them approximately $40,000 on the "deal", and Dillon would pay Pacheco whatever it

would take to recover the money or the drugs. Pacheco admitted at trial that he then suggested that he could kill Parker "and anybody else" for pay.

On April 2, 1990, Dillon again contacted Pacheco and told him that he had located the "buyer" at the Shilo Inn. When Pacheco met with Dillon, it was decided that Pacheco would go to the lobby of the Shilo Inn and call the "buyer's" room. Pacheco would then induce the buyer to come to the lobby, where the buyer could then be shot. Pacheco went to the lobby, but did not call Parker's room. Pacheco was arrested by Clark County sheriff's deputies as he left the lobby. The arresting officers read him his rights, which he waived, and he was transported to the Clark County Sheriff's office for interrogation.

Clark County Undersheriff Robert Songer interviewed Pacheco. Pacheco said that he had been conducting his own investigation of Dillon. He claimed he had not made a report to his superiors because he was afraid he would be "taken off the case" in favor of a detective.

Pacheco's house was searched, and the money that Dillon had paid him was found stuffed in a boot in his closet. Pacheco claimed he was going to turn the money in as evidence later that week.

At trial, Lieutenant John E. Grazer testified as to the drug transaction of March 26, 1990. Grazer testified that he had inadvertently discarded the envelope which undercover officers had used to hold money during the first transaction. Pacheco moved to dismiss for the State's failure to preserve material evidence. The trial court denied that motion, and allowed the State to use a similar white envelope as a demonstrative exhibit.

At the close of the State's case in chief, Pacheco moved to dismiss the charges for insufficiency of the evidence. The trial court granted the motion as to the official misconduct charge (count 7), but denied it as to all other charges.

Pacheco's counsel asked him on direct examination if he was aware that the audiotapes made by federal officers had

been ruled inadmissible. Pacheco responded that he knew the federal tapes were inadmissible, but that he had agreed to allow them to be used at his trial. On cross examination, the State asked Pacheco if it was true that he had sought, before trial, to have all of the tapes suppressed "so the jury wouldn't hear any of them." Pacheco's counsel made no objection to the question and Pacheco answered, "Not that I know of." The deputy prosecutor then asked the court for its court file in order to search for a copy of the motion. The prosecutor, after looking through the file, abandoned this line of questioning.

The jury found Pacheco not guilty of attempted first degree murder (count 2), but found him guilty of all other charges. Pacheco was sentenced to standard range sentences of 225 months on count 1, and 50 months each on counts 3 through 6. The sentences were ordered to be served concurrently.

I

DENIAL OF MOTION TO DISMISS CHARGES OF CONSPIRACY
TO COMMIT MURDER AND CONSPIRACY TO DELIVER
A CONTROLLED SUBSTANCE

Pacheco contends that the trial court erred in failing to grant his motion to dismiss the charge of conspiracy to commit murder and the charges of conspiracy to deliver a controlled substance. He claims that there could be no conspiracy because any agreement to commit the crimes took place solely between himself and an undercover police informant. Such an agreement, he suggests, is a unilateral conspiracy which does not run afoul of the language of Washington's conspiracy statute.

Washington's criminal conspiracy statute provides as follows:

(1) A person is guilty of criminal conspiracy when, with intent that conduct constituting a crime be performed, *he agrees with one or more persons* to engage in or cause the performance of such conduct, and any one of them takes a substantial step in pursuance of such agreement.

(2) It shall not be a defense to criminal conspiracy that the person or persons with whom the accused is alleged to have conspired:

(a) Has not been prosecuted or convicted; or
(b) Has been convicted of a different offense; or
(c) Is not amenable to justice; or ·
(d) Has been acquitted; or
(e) Lacked the capacity to commit an offense.

(Italics ours.) RCW 9A.28.040.

■ Pacheco's argument that there cannot be a unilateral conspiracy to commit a crime runs counter to language in *State v. Valladares*, 99 Wn.2d 663, 664 P.2d 508 (1983), wherein the Supreme Court stated:

> RCW 9A.28.040(2)(d) provides that it shall not be a defense to a charge of criminal conspiracy that the person with whom the accused is alleged to have conspired has been acquitted. In this regard, *the Washington Legislature appears to have adopted a unilateral approach to conspiracy* by focusing on the culpability of the individual actor.

(Italics ours.) *Valladares*, 99 Wn.2d at 670.

The holding in *Valladares* is consistent with the comment to section 5.03 of the Model Penal Code.[1] This is significant because Washington's criminal conspiracy statute is based

---

[1]The comment to section 5.03 of the Model Penal Code states:

"(b) *Unilateral Approach to Conspiratorial Relationship*. As previously noted, Subsection (1) departs from the traditional view of conspiracy as an entirely bilateral or multilateral relationship, the view inherent in the standard formulation cast in terms of "two or more persons" agreeing or combining to commit a crime. Attention is directed instead to each individual's culpability by framing the definition in terms of the conduct that suffices to establish the liability of any given actor, rather than the conduct of a group of which he is charged to be a part. This approach has been designated "unilateral," and it has apparently been followed in all but a few of the recently revised codes and proposals, though some of the revisions do not accept every consequence of that approach.

"The unilateral approach makes it immaterial to the guilt of a conspirator whose culpability has been established that the person or all of the persons with whom he conspired have not been or cannot be convicted. . . .

". . . .

". . . When the person with whom the defendant conspired secretly intends not to go through with the plan, it is generally held that neither party can be convicted because there was no "agreement" between two persons. Under the unilateral approach of the Code, the culpable party's guilt would not be affected by the fact that the other party's agreement was feigned. He has conspired, within the meaning of the definition, in the belief that the other party was with him; apart from the issue of entrapment often presented in such cases, his culpability is not decreased by the other's secret intention. True, the project's chances of success have

on that section of the Model Penal Code. *See State v. Valladares*, 31 Wn. App. 63, 73, 639 P.2d 813 (1982), *aff'd in part, rev'd in part on other grounds*, 99 Wn.2d 663, 664 P.2d 508 (1983). Accordingly, we uphold Pacheco's convictions for conspiracy to commit murder and conspiracy to deliver a controlled substance.

## II
### JURY INSTRUCTIONS

The trial court instructed the jury that it could convict Pacheco on the three conspiracy counts only if it found that "any one of the persons involved in the conspiratorial agreement took a substantial step in pursuance of the agreement." According to Pacheco, these instructions incorrectly stated the law because the "substantial step in pursuance" of a criminal conspiracy must be taken by the defendant, a codefendant, or someone who could have been charged with a crime, and not by a police officer or agent of the police.

■ We decline to address Pacheco's argument because he failed to except to the trial court's instructions at trial. Failure to except to a jury instruction generally precludes appellate review. *State v. Smith*, 56 Wn. App. 909, 913, 786 P.2d 320 (1990) (citing *State v. Scott*, 110 Wn.2d 682, 685-86, 757 P.2d 492 (1988)).

## III
### ADMISSION OF RECORDINGS

Pacheco assigns error to the trial court's failure to suppress the tape recordings made as part of the investigation conducted by the Clark County Sheriff. He argues that they were not admissible because the "federal" tape recordings of conversations between himself and Dillon, which provided probable cause for Clark County's recordings, were obtained in violation of his right of privacy under RCW 9.73. Recordings obtained in that manner, he asserts, may not provide a

---

not been increased by the agreement; indeed, its doom may have been sealed by this turn of events. But the major basis of conspiratorial liability, the unequivocal evidence of a firm purpose to commit a crime, remains the same. . . ."

(Footnotes omitted.) Model Penal Code § 5.03, at 398-400 (1985).

basis for establishing probable cause to record conversations pursuant to state law.

■ Pacheco is incorrect. In *State v. O'Neill*, 103 Wn.2d 853, 700 P.2d 711 (1985), our State Supreme Court held that:

> [i]nformation obtained by federal officers from electronic eaves-dropping conducted by them in accordance with federal law can legally be furnished to state officers; *and such information may, in turn, properly be used by state officers for the purpose of estab-lishing probable cause* to obtain the issuance of an order from a state court authorizing electronic eavesdropping in accordance with state statutes.

(Italics ours.) *O'Neill*, 103 Wn.2d at 867. Pacheco cites no authority supporting his argument that the federal tapes were acquired in a way that violated federal law. Conse-quently, the trial court did not err when it denied the motion to dismiss.

## IV
### CROSS EXAMINATION

■ Pacheco claims that it was error for the prosecutor to cross-examine him about whether he had sought to suppress all of the tape recordings by pretrial motion. As noted above, Pacheco's counsel did not object to the questions at trial and, consequently, he may not raise the issue on appeal. *See* RAP 2.5(a).

## V
### INSUFFICIENCY OF THE EVIDENCE TO SUPPORT CONVICTION FOR TWO COUNTS OF ATTEMPTED DELIVERY OF A CONTROLLED SUBSTANCE

■ Pacheco challenges the sufficiency of the evidence to support his convictions on counts 3 and 4, the two charges of attempted delivery of controlled substances. When a defend-ant challenges the sufficiency of the evidence, the appellate court must view the evidence in the light most favorable to the State and determine if any rational trier of fact could have found the elements of the crime beyond a reasonable doubt. *State v. Baeza*, 100 Wn.2d 487, 488, 670 P.2d 646 (1983); *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980). A claim of insufficiency admits the truth of all of the

State's evidence and any inferences that can be drawn therefrom. *State v. Theroff*, 25 Wn. App. 590, 593, 608 P.2d 1254, *aff'd*, 95 Wn.2d 385, 622 P.2d 1240 (1980).

Pacheco contends that his two convictions for attempted delivery of a controlled substance cannot be upheld because the evidence showed that his liability, if any, was as an accomplice to Dillon, who was an undercover police informant. Because Dillon was legally incapable of committing a crime, he argues, no crime was committed by him.

█ Pacheco's argument is defeated by RCW 9A.28.020(2), which provides:

> If the conduct in which a person engages otherwise constitutes an attempt to commit a crime, it is no defense to a prosecution of such attempt that the crime charged to have been attempted was, under the attendant circumstances, factually or legally impossible of commission.

In *State v. Davidson*, 20 Wn. App. 893, 584 P.2d 401 (1978), *review denied*, 91 Wn.2d 1011 (1979), we applied RCW 9A.28-.020(2), affirming a conviction for attempted possession of stolen property, and stating:

> [O]ur statute eliminates both "factual" and "legal" impossibility as defenses to a prosecution for attempt, when the "conduct in which a person engages *otherwise* constitutes an attempt to commit a crime." (Italics ours.) The use of the word "otherwise" indicates that it is now a crime to attempt to do an act which would otherwise not be criminal because of the true facts not known to the actor. The apparent reason is to punish his culpable intent.

*Davidson*, 20 Wn. App. at 897-98.

Our conclusion is also supported by *State v. Peterson*, 54 Wn. App. 75, 772 P.2d 513, *review denied*, 113 Wn.2d 1007 (1989), wherein Division One of this court upheld the conviction of Peterson as an accomplice to an informant who was acting on police orders. The court stated:

> [t]he crime here did not require an intent to do more than the proscribed act. It required only manufacture or possession with intent to manufacture or deliver. Thus, although [the police informant] in effect had the permission of the police to manufacture the speed and arguably did so without a mens rea of criminal purpose, he nonetheless "committed the crime" for

purposes of being a principal to support liability under the accomplice liability statute.

*Peterson*, 54 Wn. App. at 80-81. Similarly, here, although Dillon may not have had a criminal purpose, he did commit the crime of delivery of a controlled substance for purposes of being a principal to support Pacheco's accomplice liability.

## VI
### FAILURE TO PRESERVE EVIDENCE

Pacheco contends that the trial court erred in denying his motion to dismiss for the State's failure to preserve material evidence, to wit: the envelope that Dillon used in the March 26, 1990, drug transaction.

■ In *State v. Ortiz*, 119 Wn.2d 294, 831 P.2d 1060 (1992), a 4-vote plurality of the Washington Supreme Court adopted the federal test for determining if the State's failure to preserve potentially exculpatory evidence is a denial of due process. It said:

> unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.

*Ortiz*, 119 Wn.2d at 301-02 (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58, 102 L. Ed. 2d 281, 109 S. Ct. 333 (1988)). Here, Pacheco has shown no bad faith on the part of the State, or its agent, Lieutenant Grazer, in its disposal of the envelope. In fact, Grazer testified at trial that he threw the envelope into the trash because he thought it had no evidentiary value.[2]

---

[2]The four dissenting Justices, relying upon Const. art. 1, § 3, would apply a more stringent test:

> If a review of all the circumstances reveals a "reasonable possibility" that the evidence would have been exculpatory, then the court weighs that possibility against the State's ability to preserve that evidence.

*Ortiz*, 119 Wn.2d at 316 (Johnson, J., dissenting) (citing *State v. Vaster*, 99 Wn.2d 44, 52, 659 P.2d 528 (1983)).

Pacheco fails the dissenters' test as well. Even assuming that the State knew of the evidentiary value of the envelope at the time it was destroyed, Pacheco has not established that he was prejudiced by its destruction. Pacheco was able to argue at trial that no drug transaction really took place. He did so by using an

## VII
### INFORMANT TESTIMONY

Pacheco next contends that the trial court erred in denying his motion to dismiss the case or suppress the testimony of Dillon. Specifically, Pacheco argues that Dillon's fee arrangement violated his right to due process because it was, in essence, a contingent fee agreement. He asserts that because Dillon had not yet submitted all his bills on the case, Dillon's pay was, at least in part, contingent upon his testimony at trial. This, Pacheco argues, gave Dillon an incentive to secure his conviction.

■ Contingent fee agreements with informants are not favored in criminal cases. In *State v. Whitney*, 96 Wn.2d 578, 582, 637 P.2d 956 (1981), our Supreme Court held:

> that without some justification or explanation, the courts cannot sanction a contingent fee agreement which requires the informer to pursue a named individual and involve him in the commission of a crime.

In *Whitney*, the court determined that the fairness of the trial was not affected by the informant's having received payment because there was no showing that the informant was paid a specific sum of money to secure an arrest or obtain a conviction. Here, as in *Whitney*, there was no evidence that Dillon was paid a specific sum to secure Pacheco's arrest or conviction. The evidence showed only that Dillon was paid an hourly rate, plus expenses and mileage, and that those sums were to be paid to him regardless of the outcome. Dillon's fee arrangement with the authorities was not contingent and, thus, did not violate Pacheco's due process rights. There was no error in allowing him to testify.

## VIII
### INEFFECTIVE ASSISTANCE OF COUNSEL

Pacheco contends that his conviction should be reversed because he received ineffective assistance of counsel. Specifi-

---

envelope that was similar to the one that was lost, in order to demonstrate that it was unlikely that $16,000 could fit into the envelope that was destroyed.

cally, he contends that his trial counsel erred in failing to: (1) present the video deposition of Donald Posey; (2) object to the State's cross examination of Pacheco on the subject of his pretrial motion to suppress all audiotapes; (3) except to the trial court's instructions on accomplice liability and criminal attempt.

Washington courts have adopted the 2-prong *Strickland* test for ineffective assistance of counsel:

> [f]irst, the defendant must show that counsel's performance was deficient . . . [by] showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment [and,] [s]econd, the defendant must show that the deficient performance prejudiced the defense . . . [by] showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*State v. Davis*, 119 Wn.2d 657, 664-65, 835 P.2d 1039 (1992) (quoting *Strickland v. Washington*, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984)). There is a strong presumption of adequate assistance of counsel. *See, e.g., Strickland*, 466 U.S. at 688-89; *Davis*, 119 Wn.2d at 665; *In re Rice*, 118 Wn.2d 876, 888-89, 828 P.2d 1086, *cert. denied*, 121 L. Ed. 2d 344 (1992); *State v. Lord*, 117 Wn.2d 829, 883, 822 P.2d 177, *cert. denied*, 121 L. Ed. 2d 112 (1992). If defense counsel's trial conduct can be characterized as legitimate trial strategy or tactics, it may not serve as the basis for a claim of ineffective assistance of counsel. *See State v. Mak*, 105 Wn.2d 692, 731, 718 P.2d 407, *cert. denied*, 479 U.S. 995, 93 L. Ed. 2d 599, 107 S. Ct. 599 (1986).

### A. Failure To Present Video Deposition

Before trial, Pacheco's counsel obtained the trial court's permission to take a video deposition of Donald Posey, a retired Port of Portland police officer. This was done because Posey had a heart condition which made it difficult for him to appear at trial. The Posey deposition related, in large part, to a meeting Posey and Pacheco had in March 1990. Posey testified in his deposition that Pacheco had stated:

> I've been working this Shane . . . He's telling me that he's got mafia connections in Seattle and they've been talking about

trying to set up down here in the [Portland] metro[politan] area . . . and he said that what he'd like to do . . . is work and get his confidence so he'd get into his connections and he was sure he could bust them and his connections out of Seattle.

Posey's deposition testimony was not presented at trial.

To the extent that Posey's deposition corroborated Pacheco's testimony that his activities with Dillon were part of a 1-man police investigation of Dillon, the evidence was helpful to Pacheco. It was not helpful, however, to the extent it corroborated the State's assertion that Pacheco intentionally violated standard police procedures in conducting the investigation in this way.

Due to the fact that Posey's deposition contained both exculpatory and inculpatory evidence, defense counsel's decision not to present the video testimony at trial may be characterized as a "tactical decision" and, under *Mak*, cannot support a claim of ineffective assistance of counsel.

### B. Failure To Object to Cross Examination of Pacheco About Pretrial Motion

Pacheco contends that defense counsel's failure to object to cross examination of Pacheco on the topic of his pretrial motion to suppress all audiotapes constituted ineffective assistance of counsel. During trial the deputy prosecutor asked Pacheco if he had made a pretrial motion to suppress all audiotapes of his conversations with Dillon "so the jury wouldn't hear any of them." Pacheco responded, "Not that I know of." This line of questioning was then abandoned.

Because Pacheco answered the question in the negative and the deputy prosecutor abandoned any further questioning on the subject, there was nothing for defense counsel to object to. Accordingly, defense counsel's failure to interpose an objection cannot form the basis for a claim of ineffective assistance of counsel.

### C. Failure To Except to Jury Instructions

Finally, Pacheco contends that his trial counsel was ineffective because he failed to except to the trial court's instructions on accomplice liability. Pacheco essentially argues that

the instructions permitted the jury to convict him as an accomplice to Dillon, a person whose activities were sanctioned by the authorities. We have already indicated our rejection of Pacheco's contention that the attempted delivery of a controlled substance was factually or legally "impossible" due to police involvement. As we have stated, Pacheco's "impossibility" argument is vitiated by RCW 9A.28-.020(2), *Davidson*, and *Peterson*. Pacheco's claim that his attorney was ineffective because he failed to except to jury instructions on that topic is merely a reiteration of his challenge to the sufficiency of the evidence to support his convictions for attempted delivery of a controlled substance.

## IX
### SENTENCING

Finally, Pacheco challenges the trial court's determination that 41 to 54 months was the appropriate sentence range on his two convictions for conspiracy to deliver a controlled substance. Pacheco argues that conspiracy to deliver a controlled substance, under RCW 69.50.407, is an "unranked offense", which, according to RCW 9.94A.120(6) carries with it a maximum term of not more than 1 year of confinement.[3] He is correct. Conspiracy to deliver a controlled substance, RCW 69.50.407, is not "ranked" in RCW 9.94A.320, a statutory table by which crimes are assigned "seriousness levels". *See State v. Hebert*, 67 Wn. App. 836, 841 P.2d 54 (1992); *State v. Mendoza*, 63 Wn. App. 373, 819 P.2d 387 (1991). The sentencing court, therefore, erred in determining that the sentencing range was 41 to 54 months.

---

[3]RCW 9.94A.120(6) provides:

"If a sentence range has not been established for the defendant's crime, the court shall impose a determinate sentence which may include not more than one year of confinement, community service work, a term of community supervision not to exceed one year, and/or other legal financial obligations. The court may impose a sentence which provides more than one year of confinement if the court finds, considering the purpose of this chapter, that there are substantial and compelling reasons justifying an exceptional sentence."

Pacheco's convictions are affirmed. We remand for resentencing on counts 5 and 6 consistent with this opinion.

MORGAN and SEINFELD, JJ., concur.

Reconsideration denied August 26, 1993.

Review granted at 123 Wn.2d 1006 (1994).