# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 57876-0-II |
| Respondent, | |
| v. | |
| WILLIAM MATTHEW WATSON, | UNPUBLISHED OPINION |
| Appellant. | |

VELJACIC, J. — William Watson was convicted by a jury of robbery in the first degree under the theory of accomplice liability. On appeal, Watson argues that the State failed to present sufficient evidence to show that he acted as an accomplice to the crime of robbery. Watson also argues that the "to convict" jury instruction impermissibly relieved the State of its burden of proving an element of the crime of robbery. Finally, Watson argues that the $500 victim penalty assessment (VPA) should be stricken pursuant to a recent change in the law.

We hold that the evidence was sufficient for the jury to find Watson guilty as an accomplice to robbery in the first degree and that Watson waived review of the "to convict" instruction. Accordingly, we affirm and remand only for the trial court to strike the $500 VPA.

FACTS

I.    BACKGROUND

Watson and Tess Babauta were in a romantic relationship. They were both addicted to drugs and out of money. Babauta mentioned that she wanted to "rob" and "hit" a MetroPCS store, a store that sells tablets, cell phones, and other electronics, in order to obtain money to buy drugs.

2 Report of Proceedings (RP) at 282, 287. Babauta spoke about this with Watson several times, but he brushed it off and did not believe she would go through with it.

Watson drove Babauta to the MetroPCS in Bonney Lake. The store is located in a strip mall that shares a parking lot with a Safeway grocery store. There is a wooded area behind the strip mall. Babauta put on black snow pants, black snow shoes, a jacket that said "Chris" on it, a black face mask, a beanie, and sunglasses before getting into Watson's car. 2 RP at 279. Babauta told Watson to wait for her in his car by the gas station on the other side of the woods.

Babauta first went into the Safeway. She stole gloves and a notepad and wrote, "Hand over the money. I have a gun." 2 RP at 296. Babauta did not have a gun; however, she was carrying a torch lighter that resembled a gun, which she usually carries with her to cook drugs and light cigarettes. She then left the Safeway and went into the MetroPCS, where she approached Lauren Wright, the only employee there at the time. Babauta handed Wright the note and tapped the torch lighter on the glass to make it seem like she was carrying a gun. Wright, feeling scared and hoping to get through the incident as easily as possible, handed Babauta $1,000. Babauta ran through the wooded area behind the store. She took off her clothing and left it in the woods before she met Watson at the designated pick up location and drove away. Watson was surprised that Babauta had gone through with it. Immediately afterward, they purchased drugs and split the remaining proceeds.

About a month later, in a separate investigation, Bonney Lake Police Officer Kyle Torgenson was listening to recordings of Brandon Johnson's calls from jail. Torgenson heard a woman confess to Johnson that she had committed the robbery at MetroPCS. Through the phone records, Torgenson was able to identify the woman as Babauta. When she was arrested, Babauta admitted that she had committed the crime and that Watson had driven her to and from the scene.

II.    TRIAL TESTIMONY

Babauta pleaded guilty to robbery in the first degree and agreed to testify against Watson in exchange for a reduced sentence. In her testimony, Babauta repeatedly stated that the robbery was all her idea, and that Watson did not know the extent of what she was going to do or think she would actually go through with it. She testified that she had given Watson vague details: "I just told him that I was going to go into Safeway and that I was going to go to the store, MetroPCS, and then I was going to come out of the woods. I just told him to just be over there. Wait for me over by the gas station is what I told him." 2 RP at 289. Babauta testified further that: "[Watson] didn't think I was going to do it. He really didn't. That's why when I got in the car, I was like, I can't believe I just fucking did that." 2 RP at 307. She also testified that her and Watson often frequented the location of the robbery:

> Q. And you guys have been to this general shopping area before; correct?
> A. Almost every day because that's where we'd go to get food or get cigarettes. It was just a main location store.
> Q. Every day for basically months on end?
> A. Every day for like years.
> Q. Okay. So a thousand times, maybe?
> A. Yes.
> Q. Okay. And you had never robbed the store there before?
> A. I never robbed MetroPCS there before, no.
> Q. And you didn't have a car to drive yourself over to do this robbery by yourself, right?
> A. No, I didn't.
> Q. Okay. So you needed somebody to drive you over there; right?
> A. Yes.
> Q. And just like you had on other days, he drove you over there so you guys could go get stuff; right?
> A. Yes.

2 RP at 317-18.

Babauta further testified that she always carries a torch lighter on her:

> Q. Did he ever tell you to use a gun?
> A. No.

3

Q. Or a torch that kind of looked like a gun?

A. No.

Q. That was all your idea?

A. It was all my idea.

Q. Okay. Is that something you normally would carry with you to the store?

A. A torch?

Q. Yeah.

A. It was always in my purse or my—I was—needed it to—drugs, cigarettes. I liked torches.

Q . So this was something you carried around with you all the time?

A. Yes.

Q. So the fact that you had it wouldn't lead one necessarily to believe that you're going to use it to—use it as a fake gun to do a robbery; right?

. . . .

A. Correct.

2 RP at 319-20.

When asked how Watson had reacted, Babauta said:

Staying quiet, just kind of like in disbelief that I did do it still. Because I've never done a crime this serious before ever. Like I've gone into stores and I've stolen things, you know, but I never took it to this extent. And there's been times when, like, I'd try to get bigger items at stores and I would pull back from it. So in this particular incident, I felt like he was in the same state of mind thinking that I was going to be, like, with—in the stores with bigger items, not actually pull through with it. So it's—he was quiet, in disbelief, like he didn't know how to handle it, but we were on our way to get drugs and, so.

2 RP at 309-10.

However, Babauta also described her discussions with Watson in the days leading up to

the robbery:

I just told him—I was like, I've been scoping—I want to hit this store. That's what I said. I want to hit MetroPCS because I know I can get some money because it's easy and the woods are right there. I want to do it. I want to get the money. I need to get drugs. . . . He just was like brushing it off, as in like, okay, she's just dope-sick talking.

2 RP at 282-83.

Babauta told Watson that she was "going to do it. That was the discussion. It was more

like me demanding . . . and letting him know I'm going to do it. Because I wouldn't take no for

4

an answer." 2 RP at 305. She described that, over the course of a few days, she and Watson had driven past the store a couple of times, discussed where the cameras were, and where to park. She said that Watson saw her put on the disguise and that they discussed going to the Safeway parking lot to commit the robbery.

> A: I just started to get dressed and saying I want to go that way to the store.
> . . . Initially, wanted to go to Safeway, but then I was just wanted to rob the store, rob MetroPCS, because I needed to get the break.
> Q . Did you discuss that with Mr. Watson?
> A. Yes, I did mention it to him.
> Q . And did you discuss it, talk about it?
> A. Yes.
> Q. Did he mention to you, when you said he said don't do it, did he also mention that I'm sick, too, that kind of thing?
> A . Yes.

2 RP at 287.

Babauta also testified as to how she took advantage of the fact that Watson was in love with her. For example, she said that she "was a narcissist with him" and "would love bomb him" so she could make him do what she wanted. 2 RP at 316. As to the planning of the robbery, Babauta testified that:

> What I meant by as we planned was, like, as I told him where to be. So I know that he loves me and that he would do anything that I tell him to do. And so that was me taking advantage of that. I was like, you need to do this and this and this, and he wouldn't take no for an answer with me. So it was—it was just, yeah.

2 RP at 306.

III.    JURY INSTRUCTIONS

After closing argument, the court proceeded to review all of the jury instructions. Instruction 10, pertaining to accomplice liability, read as follows:

> A person is guilty of a crime if it is committed by the conduct of another person for which he or she is legally accountable. A person is legally accountable for the conduct of another person when he or she is an accomplice of such other person in the commission of the crime.

5

A person is an accomplice in the commission of the crime if, with knowledge that it will promote or facilitate the commission of the crime, he or she either:

(1) solicits, commands, encourages, or requests another person to commit the crime; or

(2) aids or agrees to aid another person in planning or committing the crime.

The word "aid" means all assistance whether given by words, acts, encouragement, support, or presence. A person who is present at the scene and ready to assist by his or her presence is aiding in the commission of the crime. However, more than mere presence and knowledge of the criminal activity of another must be shown to establish that a person present is an accomplice.

A person who is an accomplice in the commission of the crime is guilty of that crime whether present at the scene or not.

Clerk's Papers (CP) at 136. And instruction 11, the "to convict" instruction, stated:

To convict the defendant of the crime of robbery in the first degree as charged in Count I, each of the following six elements of the crime must be proved beyond a reasonable doubt:

(1) That on or about the 30th day of December 2021, the defendant unlawfully took personal property from Lauren D. Wright;

(2) That the defendant intended to commit theft of the property;

(3) That the taking was against Lauren D. Wright's will by the defendant's use or threatened use of immediate force, violence, or fear of injury to that person;

(4) That force or fear was used by the defendant to obtain or retain possession of the property or to prevent or overcome resistance to the taking;

(5) (a) That in the commission of these acts or in immediate flight therefrom the defendant was armed with a firearm or

(b) That in the commission of these acts or in immediate flight therefrom the defendant displayed what appeared to be a firearm[;] and

(6) That any of these acts occurred in the State of Washington.

CP at 137. Defense counsel did not object to any of the instructions provided by the court.

IV.    VERDICT

The jury found Watson guilty of robbery in the first degree. He was sentenced to 31 months in prison. The court found Watson indigent; it imposed the $500 VPA.

Watson appeals.

6

ANALYSIS

I.       SUFFICIENCY OF THE EVIDENCE

Watson argues that the State failed to present sufficient evidence to sustain his conviction for robbery.  We disagree.

A.       Standard of Review

On a claim of insufficient evidence, we review the evidence in the light most favorable to the State.  *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).  A claim of insufficient evidence admits the truth of the State's evidence.  *State v. Pacheco*, 70 Wn. App. 27, 38-39, 851 P.2d 734 (1993), *rev'd on other grounds*, 125 Wn.2d 150, 882 P.2d 183 (1994).  All reasonable inferences from the evidence must be drawn in the State's favor.  *Salinas*, 119 Wn.2d at 201.  We defer to the trier of fact's resolution of conflicting testimony, evaluation of witness credibility, and generally its view of the persuasiveness of the evidence.  *State v. Lubers*, 81 Wn. App. 614, 619, 915 P.2d 1157 (1996).  We will affirm if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  *Salinas*, 119 Wn.2d at 201.  Circumstantial and direct evidence are equally reliable.  *State v. Cardenas-Flores*, 189 Wn.2d 243, 266, 401 P.3d 19 (2017).  Also, a jury can infer specific criminal intent of a defendant where it is a matter of logical probability.  *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980).

B.       Legal Principles

"A person commits robbery when he or she unlawfully takes personal property from the person of another or in his or her presence against his or her will by the use or threatened use of immediate force, violence, or fear of injury."  RCW 9A.56.190.  Robbery in the first degree requires additional proof that the defendant is "armed with a deadly weapon; or . . . [d]isplays what

appears to be a firearm or other deadly weapon; or . . . [i]nflicts bodily injury." RCW 9A.56.200(1)(a).

A person can be convicted as an accomplice to a robbery committed by another person. RCW 9A.08.020(1), (2)(c); *State v. Trout*, 125 Wn. App. 403, 409, 105 P.3d 69 (2005). Criminal liability applies equally to a principal and an accomplice because they share equal responsibility for the substantive offense. *State v. Rodriguez*, 78 Wn. App. 769, 772-73, 898 P.2d 871 (1995).

A person is guilty of a crime as an accomplice if, "[w]ith knowledge that it will promote or facilitate the commission of the crime, he . . . (i) [s]olicits, commands, encourages, or requests such other person to commit it; or (ii) [a]ids or agrees to aid such other person in planning or committing it." RCW 9A.08.020(3)(a); *State v. Grendahl*, 110 Wn. App. 905, 910, 43 P.3d 76 (2002). An accomplice must have actual knowledge that the principal was engaging in acts constituting the criminal charge. *State v. Allen*, 182 Wn.2d 364, 374, 341 P.3d 268 (2015). The State can prove actual knowledge through the use of circumstantial evidence. *Id.* A jury can find that a person has actual knowledge when a person is aware of a fact, facts, or circumstances or result described by a statute defining an offense; or has information which would lead a reasonable person in the same situation to believe that facts exist which facts are described by a statute defining an offense. RCW 9A.08.010(1)(b). It is the intent to facilitate another in the commission of the crime through presence and actions that makes an accomplice criminally liable. *State v. Galisia*, 63 Wn. App. 833, 840, 822 P.2d 303 (1992). The State must show that the defendant aided in the planning or commission of the crime and had knowledge of the crime. *State v. Berube*, 150 Wn.2d 498, 511, 79 P.3d 1144 (2003).

And "[w]hile an accomplice may be convicted of a higher degree of the general crime he sought to facilitate, he may not be convicted of a separate crime absent specific knowledge of that

general crime." *State v. King*, 113 Wn. App. 243, 288, 54 P.3d 1218 (2002). The culpability of an accomplice cannot extend beyond the crimes of which the accomplice actually has knowledge. *State v. Roberts*, 142 Wn.2d 471, 511, 14 P.3d 713 (2000). For instance, a defendant cannot be convicted of robbery as an accomplice if he intends merely that the principal commit theft. *Grendahl*, 110 Wn. App. at 911.

> C. The Evidence was Sufficient for the Jury to Find Watson Guilty as an Accomplice to Robbery in the First Degree

The jury found Watson guilty of robbery. We next review the evidence in a light most favorable to the State. *Salinas*, 119 Wn.2d at 201; *see also Trout*, 125 Wn. App. at 409. When viewed under this standard and taken as true, the evidence was sufficient for the jury to find Watson guilty as an accomplice to robbery in the first degree.

As previously stated, when reviewing the sufficiency of the evidence, we ask whether the evidence adduced at trial could support any rational determination of guilt beyond a reasonable doubt. *Salinas*, 119 Wn.2d at 201. We do not second guess the jury, so long as the evidence at trial is sufficient to support the guilty verdict. *State v. Goins*, 151 Wn.2d 728, 730, 92 P.3d 181 (2004).

Watson's sufficiency of the evidence claim focuses on his lack of knowledge of the crime. He argues that the State's evidence did not prove that Watson shared in Babauta's criminal intent.

A review of this evidence in a light most favorable to the State suggests otherwise. Babauta told Watson several times that she planned to "rob" or "hit" the MetroPCS. 2 RP at 282, 287. She put on a disguise in front of him. They discussed the cameras around the area. Watson agreed to drive her to the location of the robbery and help her get away. Babauta told Watson to wait for her on the other side of the woods by the gas station, and Watson did exactly that. Both Watson and Babauta were experiencing symptoms of substance withdrawal and they both needed money

9

to acquire more drugs. After the robbery, they purchased drugs and shared the remaining proceeds. Looking at this evidence, when viewed in a light most favorable to the State, a jury could have found the essential elements of the crime beyond a reasonable doubt. *Salinas*, 119 Wn.2d at 201.

Watson argues this case is like *Grendahl*, and should be reversed. In that case, Grendahl waited in a getaway car and was not present when the principal committed a robbery by knocking down the victim and stealing her purse. *Grendahl*, 110 Wn. App. at 906. The evidence was unclear as to what the principal had discussed with Grendahl, and whether Grendahl knew the principal was planning to commit a robbery. *Id.* at 907-08. In his conflicting testimony, the principal stated that he told Grendahl he was going there "just to look around and see where everything would be," and that he planned to "go in there and take a purse and just come out." *Id.* at 907. Division Three of this court reversed Grendahl's conviction, finding that the jury instructions and prosecutor's closing argument misstated the law and impermissibly relieved the State of its burden to prove an element of robbery. *Id.* at 911.

Watson asserts that the same result should be reached here, because similar to Grendahl, Watson waited in a getaway car, was not present when Babauta committed the robbery, and Babauta's testimony was unclear about what details she discussed with Watson. We disagree.

While some facts here are similar to those in *Grendahl*, in this case Babauta specifically told Watson she was going to rob the store—several times. *Grendahl* is distinguishable on this fact alone. But additionally, *Grendahl* is distinguishable because our standard of review here is different. Grendahl challenged his conviction because the jury instructions and the prosecutor's closing argument misstated the law. *Id.* at 908. Here, because we are reviewing a claim of sufficiency of the evidence, we view the evidence in the light most favorable to the State.

When the evidence is viewed in the light most favorable to the State, a jury could reasonably infer that Watson knew Babauta was going to commit a robbery rather than a theft. The evidence was sufficient for the jury to find Watson guilty as an accomplice to robbery in the first degree.

II.      JURY INSTRUCTIONS

Watson urges us to review an alleged trial court error in instructing the jury. Though Watson did not object to the instruction at trial, he asserts that we should nevertheless review the issue because instruction 11 relieved the State of its burden of proving all elements of the crime beyond a reasonable doubt. More specifically, he argues that instruction 11, the "to convict" instruction, impermissibly relieved the State of its burden to prove that Watson intended to aid Babauta in committing a robbery. He asserts this constitutes a manifest error affecting a constitutional right, which would be reviewable under RAP 2.5(a)(3).[1] The State argues Watson fails to demonstrate actual prejudice because instruction 11, read in conjunction with instruction 10, was an accurate statement of law.

In addressing this argument, we first set out controlling authority regarding RAP 2.5 and instructional error. Necessarily, we consider the alleged error to determine whether it rises to manifest error affecting a constitutional right; we conclude it does not because the jury instruction was not erroneous, meaning Watson cannot show the alleged error had practical and identifiable consequences in the trial of the case. Accordingly, Watson waived this issue.

---

[1] Watson's argument about why we should review this issue under RAP 2.5(a)(3) is contained solely in a footnote. We take this opportunity to remind counsel that it is not proper to raise an argument in a footnote. *State v. Harris*, 164 Wn. App. 377, 389 n.7, 263 P.3d 1276 (2011); *State v. N.E.*, 70 Wn. App. 602, 606 n.3, 854 P.2d 672 (1993). It is within our prerogative to decline to consider arguments made in footnotes. *Id.*

11

Generally, courts do not consider issues raised for the first time on appeal. *State v. McFarland*, 127 Wn.2d 322, 332-33, 899 P.2d 1251 (1995); RAP 2.5(a). An issue, however, may be raised for the first time on appeal if there is (1) a "lack of trial court jurisdiction," (2) a "failure to establish facts upon which relief can be granted," or (3) a "manifest error affecting a constitutional right." RAP 2.5(a); *McFarland*, 127 Wn.2d at 332-33. Critically, RAP 2.5(a)(3) "is not intended to afford criminal defendants a means for obtaining new trials whenever they can 'identify a constitutional issue not litigated below.'" *State v. Scott*, 110 Wn.2d 682, 687, 757 P.2d 492 (1988) (quoting *State v. Valladares*, 31 Wn. App. 63, 76, 639 P.2d 813 (1982), *aff'd in part, rev'd in part*, 99 Wn.32d 663, 664 P.2d 508 (1983)). Instead, the exception "encompasses developing case law while ensuring only certain constitutional questions can be raised for the first time on review." *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009). And even when a defendant satisfies RAP 2.5(a)(3), the error is still subject to review under the constitutional harmless error standard. *Scott*, 110 Wn.2d at 687 (explaining that RAP 2.5(a)(3) "does not help a defendant when the asserted constitutional error is harmless beyond a reasonable doubt").

To satisfy RAP 2.5(a)(3) "and raise an error for the first time on appeal, [a defendant] must" first demonstrate that "the error is truly of constitutional dimension." *O'Hara*, 167 Wn.2d at 98. Then, a defendant must prove that the error was manifest. *Id.* Stated differently, "[t]he defendant must identify a constitutional error and show how the alleged error actually affected the defendant's rights at trial." *State v. Kirkman*, 159 Wn.2d 918, 926, 155 P.3d 125 (2007). If a party raising an argument for the first time on appeal fails to satisfy the exception articulated in RAP 2.5(a)(3), their argument is waived.

Courts "do not assume the alleged error is of constitutional magnitude;" instead, "[w]e look to the asserted claim and assess whether, if correct, it implicates a constitutional interest as compared to another form of trial error." *O'Hara*, 167 Wn.2d at 98.

"'Manifest' in RAP 2.5(a)(3) requires a showing of actual prejudice." *Kirkman*, 159 Wn.2d at 935. Actual prejudice requires a "'plausible showing by the defendant that the asserted error had practical and identifiable consequences in the trial of the case.'" *Id.* (internal quotation marks omitted) (quoting *State v. WWJ Corp.*, 138 Wn.2d 595, 603, 980 P.2d 1257 (1999)). In other words, "to demonstrate that an unpreserved error is 'manifest' for purposes of RAP 2.5(a)(3), the appellant must show that the trial court could have prevented the error, notwithstanding counsel's failure to object." *State v. Burns*, 193 Wn.2d 190, 222, 438 P.3d 1183 (2019) (Stephens, J., Concurring). "If the trial record is insufficient to determine the merits of the constitutional claim, the error is not manifest and review is not warranted.". *Kirkman*, 159 Wn.2d at 935.

"An instructional error is presumed to have been prejudicial unless it affirmatively appears that it was harmless." *State v. Smith*, 131 Wn.2d 258, 263, 930 P.2d 917 (1997). "Once an error is presumed to be prejudicial, it is the State's burden to show that it was harmless." *Id.* at 264.

"We review a challenged jury instruction de novo, evaluating it in the context of the instructions as a whole." *State v. Pirtle*, 127 Wn.2d 628, 656, 904 P.2d 245 (1995). The State must prove every necessary element of a crime beyond a reasonable doubt. *In re Matter of Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970); *State v. Marohl*, 170 Wn.2d 691, 698, 246 P.3d 177 (2010). Instructing the jury in a manner that relieves the State of its burden constitutes reversible error. *State v. Allen*, 101 Wn.2d 355, 358, 678 P.2d 798 (1984). "The rule requiring that all elements of a crime be listed in a single instruction is not violated when

accomplice liability is described in a separate instruction." *State v. Teal*, 152 Wn.2d 333, 339, 96 P.3d 974 (2004).

Watson's claim implicates a constitutional right, *Allen*, 101 Wn.2d at 358, but he does not succeed in establishing an actual error. Therefore, there were no practical and identifiable consequences at trial supporting that there was a manifest error. Again, Watson relies on *Grendahl*, to argue that instruction 11 improperly allowed the jury to impose accomplice liability for the crime of robbery when the instruction, he argues, requires only a finding that he intended to commit theft. Specifically, Watson takes issue with element (2) in jury instruction 11, a "to convict" instruction that required the jury to find "[t]hat the defendant intended to commit theft of the property." CP at 137. Watson's argument is premised on the understanding that "a defendant cannot be convicted of robbery as an accomplice if he intends merely that the principal commit theft." *Trout*, 125 Wn. App. at 410; *Grendahl*, 110 Wn. App. at 911.

Watson cannot show any error because instruction 11 was not improper. Instruction 11 informed the jury that in order to find Watson guilty of robbery in the first degree, it had to conclude all six elements were proven beyond a reasonable doubt. And within those elements, it instructed that the jury must find that "[t]he defendant intended to commit theft of the property." CP at 137. But it also required the jury to conclude "[t]hat the taking was against [the victim's] will by the defendant's use or threatened use of immediate force, violence, or fear of injury to [the victim]." CP at 137. Moreover, the instruction also required the jury to find "[t]hat force or fear was used by the defendant to obtain or retain possession of the property or to prevent or overcome resistance to the taking." CP at 137.

Additionally, *Grendahl* is distinguishable. The *Grendahl* court reversed the trial court, writing, "the dispositive issue is whether the robbery conviction must be reversed because the jury

14

instructions and the prosecutor's closing argument misstated the law regarding accomplice liability." 110 Wn. App. at 908. In *Grendahl*, the State, taking advantage of a narrow reading of the instructions, misled the jury by arguing that it had to prove theft only, not robbery. *Id.* at 909. The State did no such thing here. *Grendahl* is therefore distinguishable.

Instruction 11 did not impermissibly relieve the State of proving an element of the crime of robbery. Consequently, Watson cannot establish actual prejudice because the asserted error did not have practical and identifiable consequences at trial. Therefore, there is no manifest error affecting a constitutional right, and the issue is waived.

III.    VICTIM PENALTY ASSESSMENT

Watson asks us to strike the $500 VPA imposed on his judgment and sentence. The State concedes this point. We agree, and remand to the trial court to strike the $500 VPA from Watson's judgment and sentence.

The trial court found that Watson was indigent under RCW 10.01.160(3) and waived discretionary costs under RCW 10.01.160. When Watson was sentenced, the $500 VPA was mandatory. *See* former RCW 7.68.035(l)(a) (2018); former RCW 9.94A.6333(3)(f) (2018). However, while Watson's appeal was pending, the legislature amended RCW 7.68.035 to prohibit courts from imposing the VPA on defendants who are indigent as defined in RCW 10.01.160(3). RCW 7.68.035(4) ("The court shall not impose the penalty assessment under this section if the court finds that the defendant, at the time of sentencing, is indigent as defined in RCW 10.01.160(3)."); LAWS OF 2023, ch. 449, § 1 (effective July 1, 2023). Our Supreme Court has held that statutes regarding legal financial obligations should apply to persons on appeal. *State v. Ramirez*, 191 Wn.2d 732, 746-50, 426 P.3d 714 (2018).

The new statute became effective on July 1, 2023. *See* LAWS OF 2023, ch. 449, § 27. Watson was sentenced on February 10, 2023. Because the sentencing court found Watson indigent, and his appeal was pending when the law was amended, this change in the law applies to him.

We remand to the trial court to strike the $500 VPA from his judgment and sentence.

CONCLUSION

We affirm the trial court and remand only for the trial court to strike the $500 VPA.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Veljacic, J.

We concur:

_____
Cruser, C.J.

_____
Che, J.