105 P.3d 69 (2005)
STATE of Washington, Respondent,
v.
Adam Larson TROUT, Appellant.
No. 21633-1-III.
Court of Appeals of Washington, Division 3, Panel Three.
January 25, 2005.
*72 Carl E. Hueber, Winston & Cashatt Lawyers, Spokane, WA, William D. McCool, Attorney at Law, Walla Walla, WA, for Appellant.
Scott W. Johnson, Benton County Prosecutor's Office, Kennewick, WA, for Respondent.
SWEENEY, A.C.J.
This appeal follows a jury's finding of guilty for two counts of first degree robbery and one count of second degree assault. Adam Trout challenges the sufficiency of the evidence to support accomplice liability, essentially because the object of the intended robbery and assault changed between the time it was planned, in his apartment, and when it occurred. This record amply supports the jury's finding of guilt based on his participation in these crimes, before, during, and after. He also assigns error to the trial court's conclusion that his statement to police was voluntary. The trial judge's conclusion is again amply supported by this record. Finally he claims prosecutorial misconduct during final argument. But the State's remarks are either proper comments on the evidence or certainly not so egregious as to require reversal. We therefore affirm Mr. Trout's convictions.

FACTS
On Christmas Day 2001, Jason Fox broke into Nicholas Bunn's car and stole his car stereo system and a ceramic vase Nicholas[1] intended for his mother for Christmas. Nicholas told Adam Trout that he wanted to beat Jason with a bat.
Nicholas and others gathered at Adam's apartment to hang out and drink alcohol the next evening, December 26. Nicholas called Jason from Adam's apartment. And they had a heated discussion about Jason's theft. Jason challenged Nicholas to come over and take the stereo out of his car. Adam Trout, his brother Jarom Trout, Jordon Connor, and Cole Spencer all agreed to accompany Nicholas to Jason's apartment. The group armed themselves before leaving. Nicholas took a bat. Jordon took a gun. And Jarom took a knife.
Jason left the apartment he shared with his girl friend, Jennifer Wilson, around midnight. Jason's cousin, Trina Brooks, also lived in the apartment. Trina's boyfriend, Jeremy Anderson, was also in the apartment. So Jennifer, Trina, and Jeremy remained in the apartment.
The five men (Adam, Jarom, Jordon, Cole, and Nicholas) arrived at Jason's apartment after midnight. Jennifer heard a knock on the door and saw a gloved finger over the peephole. She opened the door a crack to peek out. Jennifer saw at least five men; one with a gun, one with a baseball bat, and another with a knife. She tried to close the door. They forced their way in. She tried to hide. The intruders crowded into a bedroom where Trina and Jeremy were sleeping. They shouted, "where's Jason?" Report of Proceedings (RP) at 610, 633, 771.
Some of the intruders jumped Jeremy. Nicholas assaulted Jennifer, Trina, and Jeremy with the baseball bat. One of the intruders held a gun to Jeremy's head. Jeremy was knocked unconscious. One of the intruders (the one with the gun) instructed the others to assault the girls. Trina and Jennifer were then assaulted. The intruders took *73 the money in Jennifer's pockets and her car keys. They took $50 from Trina as well as her identification and debit card. They took a video game player from the apartment. Nicholas took the vase on his way out. And he took Jennifer's car. Adam drove Nicholas's car. The intruders tied everyone in the apartment up with telephone cords and Christmas lights. The apartment dwellers waited until there was no more noise or activity and then went for help.
At trial, Trina testified Adam Trout was in the bedroom the entire time. She recognized Adam as the "nice guy." RP at 790, 791, 933, 934.
Police arrested Adam. The State charged him with two counts of first degree robbery for crimes against Jennifer and Trina and one count of second degree assault against Jeremy, all while armed with a deadly weapon.
Adam moved to suppress his written and oral statements to police because a detective promised lenient treatment to the first one to testify. The trial judge ultimately concluded there was no causal relationship between the implied promise and Adam's inculpatory statement and that the statement was voluntary. RP at 1376-77. The jury was instructed on accomplice liability. Adam was found guilty.

DISCUSSION

SUFFICIENCY OF THE EVIDENCE
Adam submits that he did not solicit, command, encourage, or request another to commit the crimes charged. Nor did he aid another in planning or committing the crimes charged, nor did he agree to aid. And so therefore the evidence is insufficient to convict him as an accomplice to these crimes.
We then review the evidence in a light most favorable to the State. State v. Salinas, 119 Wash.2d 192, 201, 829 P.2d 1068 (1992). A claim of insufficient evidence admits the truth of the State's evidence. State v. Pacheco, 70 Wash.App. 27, 38-39, 851 P.2d 734 (1993), rev'd on other grounds, 125 Wash.2d 150, 882 P.2d 183 (1994). All reasonable inferences from the evidence must be drawn in favor of the State. Salinas, 119 Wash.2d at 201, 829 P.2d 1068. And we, of course, defer to the trier of fact's resolution of conflicting testimony, evaluation of witness credibility, and generally its view of the persuasiveness of the evidence. State v. Lubers, 81 Wash.App. 614, 619, 915 P.2d 1157 (1996). We will affirm if any rational trier of fact could have found the essential elements of the crime. Salinas, 119 Wash.2d at 201, 829 P.2d 1068. Also a jury can infer the specific criminal intent of a criminal defendant where it is a matter of logical probability. State v. Delmarter, 94 Wash.2d 634, 638, 618 P.2d 99 (1980).
Robbery requires the unlawful taking of personal property of another or in that person's presence "against his will by the use or threatened use of immediate force, violence, or fear of injury." RCW 9A.56.190. Additionally, first degree robbery requires that the defendant be "armed with a deadly weapon; or ... [d]isplays what appears to be a firearm or other deadly weapon; or ... [i]nflicts bodily injury." RCW 9A.56.200(1)(a).
Assault in the second degree requires the knowing infliction of bodily harm designed to cause "such pain or agony as to be the equivalent of that produced by torture." RCW 9A.36.021(1)(f).
Criminal liability applies equally to a principal and an accomplice because they share equal responsibility for the substantive offense. State v. Rodriguez, 78 Wash.App. 769, 772-73, 898 P.2d 871 (1995). A person is legally accountable for the conduct of another when he is an accomplice to that person. RCW 9A.08.020(2)(c).
A person is guilty as an accomplice if, "[w]ith knowledge that it will promote or facilitate the commission of the crime, he (i) solicits, commands, encourages, or requests such other person to commit it; or (ii) aids or agrees to aid such other person in planning or committing it." RCW 9A.08.020(3)(a). To convict as either an accomplice or a principle, the jury need only be convinced that the crime was committed and that the defendant participated in it. State v. Teal, 152 Wash.2d 333, 339, 96 P.3d 974 (2004). It is the intent to facilitate another in the commission of the *74 crime by providing assistance through presence and actions that makes an accomplice criminally liable. State v. Galisia, 63 Wash.App. 833, 840, 822 P.2d 303 (1992). The State must show that the defendant aided in the planning or commission of the crime and had knowledge of the crime. State v. Berube, 150 Wash.2d 498, 511, 79 P.3d 1144 (2003).
And "[w]hile an accomplice may be convicted of a higher degree of the general crime he sought to facilitate, he may not be convicted of a separate crime absent specific knowledge of that general crime." State v. King, 113 Wash.App. 243, 288, 54 P.3d 1218 (2002) (citing In re Pers. Restraint of Sarausad, 109 Wash.App. 824, 836, 39 P.3d 308 (2001)), review denied, 149 Wn.2d 1013, 1015 (2003). But it is also clear now that the culpability of an accomplice cannot extend beyond the crimes of which the accomplice actually has knowledge. State v. Bolar, 118 Wash.App. 490, 502, 78 P.3d 1012 (2003) (citing State v. Roberts, 142 Wash.2d 471, 511, 14 P.3d 713 (2000)), review denied, 151 Wn.2d 1027 (2004). For instance, a defendant cannot be convicted of robbery as an accomplice if he intends merely that the principal commit theft. State v. Grendahl, 110 Wash.App. 905, 911, 43 P.3d 76 (2002).
Adam's challenge to the sufficiency of the evidence here focuses on the specifics of where he was (not inside during the robbery and assault but rather at the doorway) and what he did (he himself did not rob or assault anyone). But even a casual review of this evidence in a light most favorable to the State suggests otherwise. First, all of those committing these crimes sat in Adam's apartment, in his presence, and hatched the plan to go and recover property belonging to one of them by force or the threat of force. He then drove off with the group knowing that three of them had armed themselves with deadly weapons. One of the victims, Jennifer, testified that when she opened the door she saw at least five people on the porch, "[a]nd they all came barging in." RP at 630. She testified that there were five men in the room at the time one of the men asked Trina "[w]here's the money at?" RP at 637.
Trina identified one of the men as the "nice guy" because he initially said, "`[w]e're not gonna hurt you. We're just here for Jason.'" RP at 790, 917, 933, 934, 944. She said that the "nice guy" talked to her a second time where he said, "[a]re you ever gonna let Jason or your cousin stay with you again?" RP at 793, 917, 930, 944, 990. Trina stated: "He talked to me about ever letting Jason stay with me again, and basically by asking me that I think that's saying if you let him stay with you again this is gonna happen to you again." RP at 990-91.
Trina identified Adam as the "nice guy." RP at 790. She said she "got a really good look. I stared right at him and talked  the whole time I was talking to him." RP at 793. Trina stated that she specifically remembered Adam. RP at 913. She looked at Adam, but not the others in the room for a reason: "The reason why I didn't look at the people that were playing with my purse when they were a couple feet away is because they had a gun, and you're not gonna look at someone with a gun to your head." RP at 913. She testified that Adam was in the room the entire time they were being physically attacked. RP at 920, 923, 924, 927, 951, 952-53. Her impression was Adam was the one in control; and he did nothing to stop the attacks. RP at 952-53. Trina said that Adam just stood there while they were all being hurt. RP at 992. Trina testified that she believed it was Adam that eventually said, "[l]et's go, Jay." RP at 922-24.
Trina testified that other than Adam's statement that they had to go and pulling the guy off Jennifer, the "nice guy" did nothing else to stop what was going on. RP at 799-800. She also testified to the effect of Adam's presence: "More manpower. More scary. I don't know. More  it just did. I don't know how to explain it." RP at 991.
After Adam was arrested, he had several telephone conversations while he was in jail. During a recorded telephone conversation with his friend, Misty Houle, Adam said: "If I'm in here  while I'm in here I'd plead guilty `cause that's the best I'll get if I'm in here. Plead guilty." RP at 1231.
*75 Adam had another phone conversation with another friend, Marc Hinkle, and Adam said:
F____ pretty much for sure probably gonna go to the pen.
How long?
Who knows. It all depends.
It all depends on who?
The  I don't know. As long as f right now they're sayin' first degree robbery, but  so, I don't know. If all that shit comes down on me I'm f. I mean 
First degree robbery does?
Huh?
Are any of the other 
Any of the other stuff.
Then you shouldn't have a problem with that, man?
No. I didn't have anything to do with that, man. I just 
RP at 1257-58.
Marc agreed that the recorded conversation indicates that Adam was "going to the pen for robbery," and he "expresse[d] concern for other charges not the robbery." RP at 1259. Adam was worried about those charges related to the assaults of the girls, not the robberies. RP at 1259-60. Marc also admitted that from what he knew, Adam stood outside the apartment "watching or as a lookout." RP at 1295. Marc agreed that from what he knew "the defendant stood as the watch-out" when the Play Station was brought out of the apartment. RP at 1298. Marc also agreed that Adam stated he stood outside the apartment and watched, "[a]nd [that Adam] never said anything about watching out for his brother in that context." RP at 1307. Marc testified that Adam told him he knew Jordan had a gun before they went up to the apartment. RP at 1302.
Detective Craig Hanson took a statement from Adam following the crimes. The statement included information that Adam knew that three in his group were armed. And they were going to the apartment to take property, that Adam was in the apartment, and that he drove Nicholas's car home so Nicholas could steal Jennifer's car. And finally Detective Hanson said that Adam met up with Nicholas after the stolen car was destroyed. RP at 1354.
Adam agreed that he had complained about others in his group ratting on him. He admitted that he gave his cohort Nicholas time to steal Jennifer's car. And he admitted that he had intended to lie about his participation and say he was with his girl friend. He also admitted that he told a friend that he was not involved in the assaults of the girls but he never denied being involved in the robberies.
Now Adam may not have actually physically stolen the property or actually physically harmed the victims. But he knew they were all going to the victims' apartment to take property by force. Adam knew the others were armed with weapons. And one of the victims places him there and in charge during the robberies and assaults. Adam himself indicates that he went along to provide additional backup in case things got out of control.
A jury could and did find that Adam's presence promoted or facilitated the others in this robbery and assault. The evidence then, looked at in a light most favorably to the State, amply supports the jury's finding that Adam Trout acted as an accomplice to both counts of first degree robbery and one count of second degree assault.

CONFESSION VOLUNTARY
We review a trial court's findings of fact for substantial evidence. State v. Broadaway, 133 Wash.2d 118, 129-31, 942 P.2d 363 (1997).
If there is substantial evidence that a confession was voluntary, that determination by the trial court will not be altered on appeal. Id. at 131, 942 P.2d 363; State v. Ng, 110 Wash.2d 32, 37, 750 P.2d 632 (1988). A voluntary confession is the product of a rational intellect and free will. State v. Rupe, 101 Wash.2d 664, 679, 683 P.2d 571 (1984). A court determines voluntariness under the totality of the circumstances. Broadaway, 133 Wash.2d at 132, 942 P.2d 363. The court then considers any promises or misrepresentations the interrogating officers made. Id. And it considers the causal relationship *76 between those promises and the confession to determine whether the defendant's will was overborne. Id.
The circumstances of an interrogation must be evaluated to determine if a confession was voluntary. Id. The condition of the defendant and the conduct of the police are the primary considerations. Id.; Rupe, 101 Wash.2d at 679, 683 P.2d 571. A defendant's age, weakened physical or emotional state, intelligence, and experience with the police are factors in assessing his or her condition. See Rupe, 101 Wash.2d at 679, 683 P.2d 571; State v. Cushing, 68 Wash.App. 388, 392, 842 P.2d 1035 (1993). The duration and environment of the interrogation may also affect the defendant's condition. See State v. Riley, 19 Wash.App. 289, 295-96, 576 P.2d 1311 (1978). A court must also consider any promises or misrepresentations made by the interrogating officers. Broadaway, 133 Wash.2d at 132, 942 P.2d 363. But direct or implied promises do not necessarily render a confession involuntary. Id.
Adam contends that the statement he gave to police was not voluntary. He and his father were cajoled by the police promise of preferential treatment if he talked first. He also complains that the court failed to enter the findings and conclusions required by the court rules.
The criminal rules require that at the end of a "3.5 hearing" (admissibility of statement) the trial judge must set forth, in writing, "(1) the undisputed facts; (2) the disputed facts; (3) conclusions as to the disputed facts; and (4) conclusion as to whether the statement is admissible and the reasons therefor." CrR 3.5(c). The absence of findings of fact is harmless, though, if the trial court's oral opinion is clear and comprehensive and written findings would be just a formality. State v. Cruz, 88 Wash.App. 905, 907-08, 946 P.2d 1229 (1997); see also State v. Miller, 92 Wash.App. 693, 703, 964 P.2d 1196 (1998). Here, the court's oral ruling clearly spells out the reasons for his decision and is adequate for our review.
The court found that Detective Mark Weber did make the statement to Adam and Cole in the presence of Adam's father that "[w]e pretty much know who all was involved, and whoever talks first will get the best deal." RP at 508. The court concluded, nonetheless, that considering all the circumstances the confession was voluntary. Those circumstances support the trial court's finding that the confession was voluntary:
 A period of time elapsed from the detective's representation until Adam was examined at the police department.
 He was interviewed for less than an hour.
 He was advised of his rights.
 He tried to call his lawyer. There was a further time lapse while Adam located his lawyer.
 He consulted with his attorney.
 And he signed the statement only after he consulted with his attorney.
All of this led the court to conclude:
Considering all of those matters the court concludes that, as the court discussed in the case of State versus Broadaway, the evidence does not establish a causal relationship between the inferred promise and the statements made by the defendant nor does it indicate that, in fact, the statement by Detective Weber, again using the language in the Broadaway case, resulted in the defendant's will being overborne.
RP at 1376-77.
We agree. The trial judge's conclusion that the confession was voluntary is supported by this record.

GOOD FAITH INSTRUCTION
Adam requested the WPIC[2] instruction for the defense of good faith claim of title because he and his cohorts were there to recover property belonging to his friend. He contends the court erroneously refused the instruction and fashioned its own instead. See State v. Hicks, 102 Wash.2d 182, 187, 683 P.2d 186 (1984); see former RCW 9A.56.020(2) (1975-76).
*77 We review the court's specific wording of its instructions to the jury for abuse of discretion. State v. Harris, 97 Wash.App. 865, 870, 989 P.2d 553 (1999).
Adam's claim is that the court erred by fashioning its own jury instruction instead of giving the WPIC instruction for good faith claim of title. See WPIC 19.08. The erroneous instruction, he claims, left out the requirement that the State disprove the defense beyond a reasonable doubt and the State is charged with the burden of proving the absence of this defense beyond a reasonable doubt. Hicks, 102 Wash.2d at 187, 683 P.2d 186.
Here, Adam claims he was entitled to a good faith claim of title instruction because he had a good faith claim of title to the car stereo Jason took. But Adam is not charged with complicity in the theft of the car stereo, he is charged with the robbery of items from Trina and Jennifer and the assault of Jeremy. A good faith claim of title defense applies only to the claim of title in the specific property acquired. State v. Brown, 36 Wash.App. 549, 559, 676 P.2d 525 (1984) (citing State v. Larsen, 23 Wash.App. 218, 219, 596 P.2d 1089 (1979)). And more importantly, it cannot be said that the property taken in the robbery "was appropriated openly and avowedly under a claim of title made in good faith." Former RCW 9A.56.020(2).
The evidence here does not support any good faith claim of title. And certainly, the court did not abuse its discretion in any event by giving the instruction it gave.

PROSECUTORIAL MISCONDUCT
Finally, Adam contends that the prosecutor committed misconduct by expressing his personal beliefs, making inflammatory remarks, stating personal opinions of his guilt and of the credibility of witnesses, and by stating his own belief as to the "justness" of a guilty verdict.
A defendant must show that the prosecutor's conduct was both improper and prejudicial. State v. Davis, 141 Wash.2d 798, 840, 10 P.3d 977 (2000); State v. Stenson, 132 Wash.2d 668, 718, 940 P.2d 1239 (1997). Prejudice is established only if there is a substantial likelihood the improper comments affected the verdict rendered by the jury. Stenson, 132 Wash.2d at 718-19, 940 P.2d 1239. And when no objection is made at trial, the issue may be reviewed only if it is "so flagrant and ill intentioned that it evinces an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury." State v. Hoffman, 116 Wash.2d 51, 93, 804 P.2d 577 (1991); Stenson, 132 Wash.2d at 719, 940 P.2d 1239; Davis, 141 Wash.2d at 840, 10 P.3d 977.
We place the State's remarks in the context of the entire argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury. State v. Brown, 132 Wash.2d 529, 561, 940 P.2d 546 (1997). And the prosecutor has wide latitude in drawing and expressing reasonable inferences from the evidence. State v. Millante, 80 Wash.App. 237, 250, 908 P.2d 374 (1995).
Adam charges the prosecutor with a variety of improper remarks. The prosecutor commented on the defendant's guilt. He vouched for a witness's credibility, and otherwise made remarks specifically calculated to arouse the passion and prejudice of the jury. Adam objected to some of the remarks he now complains of, but not others. He objected to the following comment:
It's sometimes forgotten in closing argument when we over explain things trying to drive home points that I know you know. I'm going to limit my argument because I know you know the facts of this case, and I know you know what the right outcome to this case is. There's only one just and reasonable outcome, and that's guilty.
RP at 1629-30. The court overruled and instructed: "I remind the jury that you know this is closing argument and may not be considered in any way being evidence." RP at 1630.
In rebuttal, the prosecutor argued:
The defendant is entitled to his day in court. The defendant's entitled to come in here and make the State prove its case. We've proven our case. There are very few cases in which you're going to get *78 more evidence of guilt than you're gonna get in this case. If this isn't enough evidence to convince you beyond a reasonable doubt then I'd submit to you there are gonna be very few cases where anybody could be convinced beyond a reasonable doubt.
This isn't a case where it's in a gray area. This isn't a case where after closing arguments are done I'm gonna go home and worry. Oh, I'm gonna be nervous, but I'm not gonna worry because there's overwhelming evidence of guilt in this case.
[DEFENSE COUNSEL]: Your Honor, I object. Counsel again is personalizing, and that is prosecutorial misconduct.
[PROSECUTOR]: I'm certainly not personalizing it, your Honor.
THE COURT: You may proceed. I have previously instructed the jury. They understand they must rely on their own recollection of the evidence.
RP at 1685-86.
The comment, when placed in context, is a typical prosecutorial comment on the sufficiency of the evidence  it is overwhelming. Millante, 80 Wash.App. at 251, 908 P.2d 374. This is particularly so when Adam must show that the prosecutor is not arguing inferences from the evidence but is rather expressing a personal opinion. State v. Sargent, 40 Wash.App. 340, 344, 698 P.2d 598 (1985). This must be "clear and unmistakable." Id. The over exuberant argument by the State is maybe unfortunate and probably unnecessary. But the judge responded appropriately by telling the jury to recall the evidence.
Adam claims prejudicial misconduct from other statements. However, he did not object to this remark:
Trina Brooks isn't confused about what the defendant told you on the stand. He told ya' he aided and assisted by his words and actions in this crime. Believe Trina Brooks. She's telling you what she saw. She's telling you the truth as she saw it, but even if you don't you don't need to. You don't need to.
RP at 1643-44. Nor did he object to other remarks he now assigns error to here on appeal:
Officer Ryan Bonnalie and Wendy Manthey testified, and they testified about the initial statements of Jennifer Wilson, Trina Brooks and Jeremy Anderson. What's important about their initial statements are that it's consistent with what we know happened, with what the defendant admits happened. That there were five people that went into that apartment.
RP at 1637.
It will be guilty because the defendant is guilty in Count I of robbing Jennifer Wilson. The defendant is guilty in Count II of robbing Trina Brooks. The defendant is guilty in Count III of assaulting Jeremy Anderson, and the defendant is guilty of all three weapon enhancements. Justice demands these verdicts, and I'm confident you'll bring them back.
RP at 1650-51.
Justice demands guilty verdicts. I trust, I know you'll do the right thing. Any other outcome is unjust. It's unjust by the law, and I know you'll return guilty verdicts on all counts against the defendant.
RP at 1687.
Ladies and gentlemen, you know the facts of this case. You know the evidence in this case, and you know what the defendant did. It's not an easy choice, but it is the only choice that justice will allow. To say the defendant is not guilty of these crimes is to say it's all right. It's all right to help plan an assault in the taking back of property. It's all right to help plan a robbery.
It's all right to know about the robbery two days before it happens. It's all right to know about a robbery the day it happens. It's all right to put on hats and bandanas. It's all right to take a shotgun and a bat. It's all right to stand lookout. It's all right to see people taking property you know not yours is taken out. It's all right to drive the get-away car. It's all right to take that stolen car that you know is stolen and watch it destroyed.
It's all right to wait while the people are destroying that car, and then it's all right to go back to the apartment where that car was stolen  I'm sorry, go back to the *79 apartment where you live after you've committed these acts. If you find the defendant not guilty, that's all right.
RP at 1686-87.
His burden is to show that the State's comments here could not have been cured by instructions from the court. Hoffman, 116 Wash.2d at 93, 804 P.2d 577. And earlier the trial judge admonished the jury to rely on its own recollection of the evidence. And it gave a similar written instruction to "[d]isregard any remark, statement or argument that is not supported by the evidence or the law as stated by the court." Clerk's Papers at 225. This instruction was also given orally before the remarks were made. RP at 1613.
The jury is presumed to follow the court's instructions. State v. Krause, 82 Wash.App. 688, 697, 919 P.2d 123 (1996). Moreover, we would have to conclude that these remarks materially affected the outcome of this trial in order for us to reverse. State v. Tharp, 96 Wash.2d 591, 599, 637 P.2d 961 (1981). And given the evidence of Adam's involvement in these crimes from their planning, to his participation in the crimes, and his later statements to police and friends, we are not able to say the prosecutor's final arguments materially affected the outcome here.
We affirm the convictions.
I CONCUR: BROWN, J.
SCHULTHEIS, J. (dissenting).
Because there is insufficient evidence that Adam Trout did anything in association with the principal to accomplish the crimes carried out, or that he was ready to assist in the crimes charged, I respectfully dissent. Further, even if the evidence was sufficient to sustain the convictions, I would find that prosecutorial misconduct requires reversal.

COMPLICITY
For accomplice liability to attach there must be evidence that the accomplice did something in association with the principal to accomplish the crime. State v. Murray, 10 Wash.App. 23, 28, 516 P.2d 517 (1973); State v. Boast, 87 Wash.2d 447, 455-56, 553 P.2d 1322 (1976). The person giving aid must participate in the crime charged "as something he wishes to bring about, and by action to make it succeed." Boast, 87 Wash.2d at 456, 553 P.2d 1322. "Mere presence at the scene of a crime, even if coupled with assent to it, is not sufficient to prove complicity. The State must prove that the defendant was ready to assist in the crime." State v. Luna, 71 Wash.App. 755, 759, 862 P.2d 620 (1993) (emphasis added); see also State v. Rotunno, 95 Wash.2d 931, 933, 631 P.2d 951 (1981)(quoting In re Welfare of Wilson, 91 Wash.2d 487, 491, 588 P.2d 1161 (1979)).
Accomplice liability does not "impose strict liability on putative accomplices for any and all crimes." In re Pers. Restraint of Sarausad, 109 Wash.App. 824, 835, 39 P.3d 308 (2001). "The Legislature intended that an accomplice ' "have the purpose to promote or facilitate the particular conduct that forms the basis for the charge"' and the accomplice '"will not be liable for conduct that does not fall within this purpose."'" Id. (quoting State v. Roberts, 142 Wash.2d 471, 510-11, 14 P.3d 713 (2000) (quoting from the comment to Model Penal Code § 2.06(3)(a), which is identical to RCW 9A.08.020(3)(a))).
As the majority points out, the evidence shows that Adam accompanied Nicholas Bunn and others, some of whom were armed, in order to confront Jason Fox and reclaim the stereo Jason had stolen from Nicholas. The group probably intended to use force if it was necessary to get the stereo back from Jason, and Nicholas probably wanted retribution from Jason. But that plan was distinctly altered once the group arrived at Jason's apartment and determined he was not there. Adam had nothing to do with the crimes that were actually committed at the apartment. None of the witnesses identified Adam as having a role in those crimes.[1] *80 Trina Brooks, the only witness who identified Adam as being present, testified that Adam did nothing but stand there; he did not assault or take property from anyone there, or encourage anyone else to do any of these things. Report of Proceedings (RP) at 791, 793, 845, 913, 920, 937, 939, 945, 948, 951, 952, 973-74. In fact, she credits Adam with stopping the assaults of the girls and making the intruders leave. RP at 794, 798, 917.
When the intruders first arrived at Nicholas's apartment, the victims heard them shouting "where's Jason?" RP at 610, 633, 771. One victim saw that the intruders "were talking to Jeremy because they thought Jeremy was Jason." RP at 702. Trina recognized Adam as the "nice guy" who told her that she would not be hurt; that they were there for Jason. RP at 790, 791, 930, 934. This evidence demonstrates that the intruders were executing the original plan to confront Jason. It was not until the group determined that Jason was not present that the initial plan transmuted into the mayhem that thereafter ensued. Because most of the activities the majority opinion cites as evidence of Adam's involvement occurred before this change of the planned course of events, I cannot concur with its result on that basis.
The fact that the initial plan did not involve confronting or hurting anyone except Jason is reflected in Trina's apparent nonchalance in her awareness that Nicholas was coming over that evening to confront Jason. Trina overheard Jason's conversation with Nicholas. RP at 898-99. From this she knew Jason stole Nicholas's property and Jason challenged Nicholas to come and get it. RP at 899. She testified that when she saw Nicholas in her apartment that night, she knew why he was there; she even expected a visit from Nicholas that evening to confront Jason. RP at 771, 898-99. The conversation Trina overheard took place at the same time that Nicholas was devising the plan to confront Jason. From this conversation, Trina knew Jason was in trouble with Nicholas; but there was nothing in the conversation that made her feel threatened. This is evidence that while the plan to confront Nicholas was being formulated, the plan did not include hurting Trina or anyone else. The fact that Trina and others were ultimately brutally assaulted and their property was taken evinces a change in that plan. Significantly, there is no evidence to show that Adam participated in any fashion with such a change.
"The mens rea for accomplice liability is knowledge, and the legislature intended that the culpability of an accomplice not extend beyond the crimes of which the accomplice actually has knowledge." State v. Bolar, 118 Wash.App. 490, 502, 78 P.3d 1012 (2003)(citing Roberts, 142 Wash.2d at 511, 14 P.3d 713), review denied, 151 Wn.2d 1027 (2004). An accomplice may not be convicted of a crime absent specific knowledge of that general crime. State v. King, 113 Wash.App. 243, 288, 54 P.3d 1218 (2002) (citing Sarausad, 109 Wash.App. at 836, 39 P.3d 308), review denied, 149 Wn.2d 1013, 1015 (2003)
The record shows that Adam, at the most, had knowledge that his presence might assist in the initial plan to confront Jason and reclaim Nicholas's property. However, there is no evidence that he knew that any of his actions would promote or facilitate the commission of the crimes charged. RCW 9A.08.020(3)(a). Accomplice liability requires proof that the person charged knew he was aiding in the commission of the charged crime, not merely that defendant knew he was aiding in planning or committing some crime. State v. Gallagher, 112 Wash.App. 601, 608, 51 P.3d 100 (2002), review denied, 148 Wash.2d 1023, 66 P.3d 638 (2003).
In King, 113 Wash.App. at 288, 54 P.3d 1218, Division One of this court reversed and dismissed with prejudice a kidnapping conviction of an accomplice in a home invasion robbery. There the court found that though the evidence was sufficient to convict for accomplice liability on the crime of robbery, there was no evidence to show that the kidnapping was part of the original plan; rather the decision to put the victims in the trunk of *81 the car was a spontaneous one made by other accomplices. Id. The same is true here  the crime that was actually committed by others is too far removed from the crime planned to hold Adam responsible. Even if the assault and robbery of others was a foreseeable outcome of the planned confrontation and possible assault of Jason, foreseeability is an insufficient basis to establish accomplice liability. State v. Stein, 144 Wash.2d 236, 246, 27 P.3d 184 (2001).
After the events deviated from the initial plan to confront Jason, the majority points to Adam's presence or implied presence during the demand for money and assaults of the girls. But presence, standing alone, cannot evince complicity. Rotunno, 95 Wash.2d at 933, 631 P.2d 951 (quoting Wilson, 91 Wash.2d at 491, 588 P.2d 1161). One's presence during the commission of a crime, even if accompanied by knowledge that one's presence would aid in the commission of the crime, will not subject one to accomplice liability unless that person is "ready to assist" in the commission of the crime. Rotunno, 95 Wash.2d at 933, 631 P.2d 951.
The majority opinion observes that Trina testified that Adam did nothing to stop the attacks. However, this cited assertion  a single affirmative response to the prosecutor's leading question  is utterly irreconcilable with recurring and detailed testimony in which she credits Adam with stopping the assaults of the girls and making the intruders leave. RP at 794, 798, 917. Further, the failure to stop a crime cannot establish complicity. State v. Jackson, 137 Wash.2d 712, 724-25, 976 P.2d 1229 (1999).
The majority also cites Trina's testimony that Adam was "in control." RP at 952. This cited assertion  again a single affirmative response to the prosecutor's leading question  is grounded upon knowledge she gained from watching television shows in which she purportedly learned that the person in charge is also the person who does nothing. RP at 988-89. This is a conclusion which Trina could not support by articulating some factual basis. She could not describe what Adam was doing  besides nothing  to lead her to such a conclusion. Evidence that Adam was doing nothing cannot sustain a complicity determination. More significant to the control issue is Trina's concession that Adam did not give orders to anyone to do anything. RP at 989. Even more noteworthy is Trina's testimony that Adam did tell one person, his brother, to leave; but "[n]obody else ... paid any attention to him." RP at 990. This is wholly inconsistent with the claim that Adam was "in charge."
The majority opinion noted Trina's isolated mention that Adam's presence was menacing. First, Trina could not articulate what she meant by that, except to say it made the event more frightening. RP at 991. Second, her testimony of Adam as a menacing presence cannot be reconciled with her otherwise consistently repeated reference to Adam as "the nice guy." RP at 787-92, 798, 807-10, 812, 816-17, 828-29, 835, 838-39, 845, 848-49. Further, even if Adam's presence was menacing to the extent that it made Trina more frightened, she did not associate that fear with her relinquishment of property as required by the robbery charge.
The majority opinion indicates that Marc Hinkle's testimony that Adam told him he was a "lookout" supports the conviction. First, even if Adam did act as a lookout, there is no evidence that he acted in that capacity after the plan changed from confronting Jason to assaulting and robbing the others. Second, the record shows that Marc did not testify that Adam said he was a "lookout." Marc testified for the State regarding conversations he had with Adam over the jail telephone, some of which were recorded and played for the jury. On the tape, Adam was heard to say, "I stood out and watched, and I ran in and got `em. That's pretty much what I did." RP at 1275. Marc testified that Adam did not use the word "lookout" in reference to his presence at the apartment except to the extent that he was "looking out" for his brother. RP at 1283, 1302-03. Marc also agreed that it was never his understanding from his several conversations with Adam that Adam was acting as a lookout "to help these guys do whatever they were doing inside the apartment." RP at 1303. The majority's reference to Marc's agreement that "[Adam] never said anything about watching out for his *82 brother" related to what Adam was heard to say during a specific segment of the tape recording. RP at 1307. In other words, the State played a segment of the tape; Marc then testified that he did not hear Adam say, in that portion of the tape, that Adam was watching out for his brother. That testimony is superfluous in any event because the jury heard the taped segment for itself.
On the record, the prosecutor repeatedly pressured Marc to say that Adam was acting as a "lookout." RP at 1279, 1295, 1299. But Marc did not say it. In fact, the defense objected to the State's attempt to characterize Marc's testimony and protested it as the prosecutor's attempt to testify. The court agreed and sustained the objection. RP at 1305-07.
Adam's written statement to Detective Craig Hanson, which Detective Hanson read on the record at trial, is also cited by the majority. However, the statement was not that the group went to simply "take property," but they went to reclaim specific property (Nicholas's) from a specific person (Jason) and beat up a specific person (Jason). RP at 1419-24. Indeed, Adam specifically told Detective Hanson that he did not expect the mayhem that actually ensued. RP at 1424.
The majority notes that Adam drove Nicholas's car away from the crime scene. However, driving the principal's car after the crime cannot be proof of complicity because the force used to take the victim's car had already been carried out. State v. Robinson, 73 Wash.App. 851, 857, 872 P.2d 43 (1994). As noted in Robinson, driving the car away under these circumstances might be more akin to rendering criminal assistance. Id. at 858, 872 P.2d 43. See RCW 9A.76.050(3) (providing that a person is guilty of rendering criminal assistance "if, with intent to prevent, hinder, or delay the apprehension or prosecution of another person who he knows has committed a crime ... he ... [p]rovides such person with ... transportation ... or other means of avoiding discovery or apprehension"). But, as in Robinson, Adam was not charged with rendering criminal assistance. Robinson, 73 Wash.App. at 858, 872 P.2d 43.
Further, the majority opinion mentions the question that Trina attributed to Adam  whether she would ever let Jason stay with her again. Although it is a callous remark, it merely shows assent. Accomplice liability requires more than mere assent. State v. Peasley, 80 Wash. 99, 100, 141 P. 316 (1914). "To assent to an act implies neither contribution nor an expressed concurrence. It is merely a mental attitude which, however culpable from a moral standpoint, does not constitute a crime, since the law cannot reach opinion or sentiment however harmonious it may be with a criminal act." Id. Accomplice liability requires "some form of overt act; the doing or saying of something that either directly or indirectly contributes to the criminal act; some form of demonstration that expresses affirmative action, and not mere approval or acquiescence, which is all that is implied in assent." Id. The only action attributed to Adam in the course of these events is Adam's attempt to stop the assaults. And that does not invoke criminal liability.
Finally, the majority opinion concludes that "A jury could and did find that Adam's presence promoted or facilitated the others in this robbery and assault." Majority at 10. However, as noted, mere presence is insufficient to establish complicity. Rotunno, 95 Wash.2d at 933-34, 631 P.2d 951; Wilson, 91 Wash.2d at 491, 588 P.2d 1161. Presence is a component of being ready to assist. Rotunno, 95 Wash.2d at 933-34, 631 P.2d 951. One must be both present and ready to aid in the commission of a crime to establish accomplice liability. See also 11 WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 10.51 (2d ed. 1994) ("A person who is present at the scene and ready to assist by his or her presence is aiding in the commission of the crime. However, more than mere presence and knowledge of the criminal activity of another must be shown to establish that a person is an accomplice." (Emphasis added.)). There is no evidence that Adam was both present and ready to assist in the charged crimes.

PROSECUTORIAL MISCONDUCT
Adam charges that a number of the prosecutor's remarks commented on his guilt, *83 vouched for witnesses' credibility, and otherwise were specifically calculated to arouse the passion and prejudice of the jury. The defense did not object to some of the remarks.
Adam did object to the prosecutor's personal views of the evidence. RP at 1629-30, 1685-86. Adam's objections were overruled, and the court instructed the jury, "I remind the jury that you know this is closing argument and may not be considered in any way being evidence." RP at 1630, 1686. "It is improper for a prosecutor to express his personal opinion about ... the guilt or innocence of the accused in jury argument." State v. Sargent, 40 Wash.App. 340, 343-44, 698 P.2d 598 (1985) (citing State v. Reed, 102 Wash.2d 140, 684 P.2d 699 (1984)). It is not misconduct for the prosecutor to argue inferences from the evidence. State v. Brett, 126 Wash.2d 136, 175, 892 P.2d 29 (1995). Therefore, prejudicial error will not be found unless it is "clear and unmistakable" that the prosecutor is not arguing inferences from the evidence, rather than expressing a personal opinion. Sargent, 40 Wash.App. at 344, 698 P.2d 598.
The State argues that these remarks constitute reasonable inferences from the evidence. It does not explain how instructing the jury that a guilty verdict is the only just and reasonable outcome is such a reasonable inference. More problematic is the second passage cited in the majority opinion. The prosecutor essentially tells the jury that he has rarely seen a more perfect case. This implicates the prosecutor's own personal experiences.
In State v. Case, 49 Wash.2d 66, 298 P.2d 500 (1956), the court outlined the prosecutor's responsibility for a fair trial:
"Language which might be permitted to counsel in summing up a civil action cannot with propriety be used by a public prosecutor, who is a quasi-judicial officer, representing the People of the state, and presumed to act impartially in the interest only of justice. If he lays aside the impartiality that should characterize his official action to become a heated partisan, and by vituperation of the prisoner and appeals to prejudice seeks to procure a conviction at all hazards, he ceases to properly represent the public interest, which demands no victim, and asks no conviction through the aid of passion, sympathy or resentment."
And in the dissent in that case, it is said:
"The district attorney is a high public officer, representing the state, which seeks equal and impartial justice, and it is as much his duty to see that no innocent man suffers as it is to see that no guilty man escapes. In the discharge of these most important duties he commands the respect of the people of the county and usually exercises a great influence upon jurors. In discussing the evidence he is ... given the widest latitude within the four corners of the evidence by way of comment, denunciation or appeal, but he has no right to call to the attention of the jury matters or considerations which the jurors have no right to consider."
Id. at 70-71, 298 P.2d 500 (quoting People v. Fielding, 158 N.Y. 542, 547, 53 N.E. 497 (1899)). A prosecutor's "`devotion to duty is not measured, like the prowess of the savage, by the number of their victims.'" Reed, 102 Wash.2d at 147, 684 P.2d 699 (quoting State v. Montgomery, 56 Wash. 443, 447-48, 105 P. 1035 (1909)).
As a quasi-judicial officer the prosecutor has a duty to see that an accused is afforded a fair trial. State v. Walton, 5 Wash.App. 150, 152, 486 P.2d 1118 (1971) (citing State v. Huson, 73 Wash.2d 660, 440 P.2d 192 (1968)). This duty is not fulfilled when the prosecutor "throw[s] the prestige of his public office, information from its records, and the expression of his own belief of guilt into the scales against the accused." Case, 49 Wash.2d at 71, 298 P.2d 500. But that is precisely what the prosecutor did in this case. These remarks are improper.
The prejudicial effect of the statements is reflected by the fact that the jury convicted Adam despite evidence that was far from overwhelming. The case came down to the credibility of one witness, Trina Brooks, whose credibility the prosecutor came close to personally vouching for. RP at 1643-44. Adam did not object to those remarks. RP at 1637, 1650-51, 1686-87. Since no objection *84 was made, Adam must show the argument was incurably prejudicial. State v. Belgarde, 110 Wash.2d 504, 507, 755 P.2d 174 (1988).
It should be noted that none of the objections Adam made during argument were sustained and few were even ruled on.[2] The trial judge did not specifically admonish the prosecutor or the jury that the prosecutor's argument was improper. The judge merely told the jury that it must rely on its own recollection of the evidence. RP at 1630, 1686. Even with the instructions and admonitions, the trial judge's failure to rule on the objections, or to acknowledge that these comments were in fact improper, rendered the instructions meaningless. The misconduct could not have been cured by any instructions the court would have given even had there been objections to all of the improper statements, because those instructions previously given to other objections were ineffectual.
In Case, 49 Wash.2d 66, 298 P.2d 500, the Washington Supreme Court found prejudicial prosecutorial misconduct in the prosecutor's references to his thoughts and past experiences. The defense counsel objected to some, but not all, of such comments, but the trial judge issued equivocal rulings and admonitions in connection with the objected-to portions of the argument. Id. at 73, 298 P.2d 500. Such was the case in Adam's trial.
Here, the defense objected to the prosecutor's comment that the relative strength of his case against Adam far exceeded all but a "very few" cases of its type and that he had no worries about what the jury was going to decide. RP at 1685. The prosecutor protested that he was not making personal comments. RP at 1685. The court then stated, "You may proceed. I have previously instructed the jury. They understand they must rely on their own recollection of the evidence." RP at 1686. Then, also as in Case, the prosecutor was heard complaining that the objections were curtailing his argument when he commented, "I'm gonna try to finish now." RP at 1686.
The court in Case acknowledged that "other objections and motions should have been made on behalf of the defendant, even at the risk of a series of unseemly wrangles." Case, 49 Wash.2d at 73, 298 P.2d 500. The same is true here. Nonetheless, the Supreme Court found that the facts in Case presented an occasion where the "cumulative effect of repetitive prejudicial error becomes so flagrant that no instruction or series of instructions can erase it and cure the error." Id.
Case also held that because the prosecutor's personal statement  that defendant did not object to  regarding the defendant's guilt was not prefaced with "`The evidence establishes that' "the statement could not be interpreted "as anything other than an attempt to impress upon the jury the deputy prosecuting attorney's personal belief in the defendant's guilt." Case, 49 Wash.2d at 68, 298 P.2d 500. This, the court observed, "was not only unethical but extremely prejudicial." Id.
Here, as in Case, there are a number of grievous comments, the cumulative effect of which cannot be ignored. Because the evidence is not overwhelming, it cannot be said that the result would not have been different. I would rule that Adam is therefore entitled to a new trial. Case, 49 Wash.2d at 76, 298 P.2d 500.

CONCLUSION
Since I find insufficient evidence of conduct on Adam's part to support a conviction on the basis of accomplice liability, I must dissent as I would reverse and dismiss. I find the prosecutor's remarks improper and the trial judge's response to them of a nature that the instructions given to the jury (or those which could have been given) were ineffectual and the evidence to be so close, I cannot endorse the majority's determination that any error was harmless.
NOTES
[1] For clarity we are using only first names because of the number of people involved.
[2] 11 WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL (2d ed. 1994) (WPIC).
[1] None of the victims could initially give a description of the intruders to police. Report of Proceedings (RP) at 1344. At trial Jennifer Wilson testified that she had met Adam approximately six months prior at a party at his apartment. RP at 641, 748, 750, 752. But she did not remember seeing Adam at her door or inside her apartment on the night of the crime. RP at 642, 644, 750-52. She said she had not seen Adam since July or August 2001. RP at 752. Jeremy Anderson testified that he did not know whether he saw Adam at all that night. RP at 1009.
[2] Besides the two occasions discussed above, Adam objected to another remark which he does not enumerate as forming the basis of his prosecutorial misconduct claim. RP at 1684.