# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>     Respondent,<br><br>v.<br><br>BRANDON CALVIN KNOTH,<br><br>     Appellant. | No. 78760-8-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION<br><br><br>FILED: January 27, 2020 |

MANN, A.C.J. — Brandon Knoth appeals the judgment and sentence imposed upon his conviction for assault in the second degree. He contends the evidence was insufficient to support the aggravating factor that the victim's injuries substantially exceeded the level of bodily harm necessary to satisfy the elements of the offense and that the criminal filing fee should be stricken. We remand for the trial court to strike the criminal filing fee from the judgment and sentence. We otherwise affirm.

I.

On the evening of June 5, 2016, John Schmidt went to O'Houlies bar in Mountlake Terrace to play pool. Schmidt was a regular at the bar and he knew the bartenders. Throughout the evening, Schmidt consumed three or four rum and Coke cocktails. In the early morning hours of June 6, Schmidt decided to go home. While putting his pool stick in the trunk of his car, Schmidt "heard a commotion." A group of

four people were standing to the right of the entrance to O'Houlies. Schmidt saw a man in the group grabbing the hair of a woman in the group, and he thought she was in trouble. Schmidt asked the woman if she needed help. He remembered being "rushed" and knocked down by a man in the group, who was later identified as Knoth. Schmidt got up and tried to go back to his car. The next thing he remembered was waking up at Harborview Medical Center.

Knoth's wife Alicia testified that she, Knoth, and the other couple were hanging out in the parking lot "just kind of dancing and being loud and obnoxious, probably" when Schmidt walked up and said "derogatory things like we were hookers or prostitutes or something." She said Schmidt told Knoth "[y]ou're a dead man" right before Knoth chased him around the car. She said she did not see what happened after that.

The bartender, Kyle Halbert, recalled serving drinks to a group of two men and two women who came into O'Houlies at around 1:15 or 1:30 a.m. Because it was so late, Halbert assumed they had been drinking before they arrived. One of the women fell down, and Halbert took away her drink. The group left the bar at around 2:00 a.m. One of them left a cell phone in the bar, so Halbert took it out to them. The two women were sitting on the curb, and the two men were "horseplaying around." Another employee left the bar, then immediately returned to tell Halbert that Schmidt was laying on the ground outside. Halbert went outside and found Schmidt unconscious with blood on the ground near his head. Halbert immediately called 911.

Video surveillance showed Schmidt pointing and walking across the parking lot towards the group. Schmidt and Knoth appeared to exchange words. Then Knoth

2

adopted a fighting stance and bounced in a circle around Schmidt. A woman appeared to pull Knoth away, and Knoth and Schmidt walked away from each other. Knoth then approached Schmidt and punched him in the chest, knocking him to the ground. Schmidt slowly stood up, walked across the parking lot, then turned around and walked back to his car. Knoth suddenly came running around the rear of Schmidt's car towards him. Schmidt turned to run away, and Knoth appeared to catch up with him just off camera. Knoth then ran back to his car and the group quickly drove away.

Schmidt was taken to Swedish Hospital in Edmonds, then transferred to Harborview Medical Center. There, Dr. Randall Chesnut, a neurosurgeon, performed emergency surgery to relieve swelling on Schmidt's brain. Schmidt remained at Harborview for a month. When he got out of the hospital, he could not speak or swallow and had a tube in his stomach for three months.

The State charged Knoth by information with one count of assault in the first degree. Shortly before trial, the State filed an amended information charging Knoth with one count of assault in the second degree with an aggravating factor that Schmidt's injuries "substantially exceeded the level of bodily harm necessary to satisfy the elements of the offense."

At trial, Dr. Chesnut described in detail the "catastrophic" nature of Schmidt's brain injury and testified that without surgical intervention, the "likely outcome" was "quite possibly death." Schmidt testified to the losses he suffered following the assault, including ongoing problems with equilibrium, balance, speech, and memory.

The jury found Knoth guilty of assault in the second degree. The jury returned a special verdict that "the victim's injuries substantially exceed[ed] the level of bodily harm

necessary to constitute substantial bodily harm." The court imposed an exceptional sentence of 48 months of confinement.[1] Knoth appeals.

## II.

Knoth contends that there is insufficient evidence to support the aggravating factor. We disagree.

Facts supporting an aggravating circumstance must be proved to a jury beyond a reasonable doubt. RCW 9.94A.537(3); State v. Guzman Nuñez, 174 Wn.2d 707, 711, 285 P.3d 21 (2012). "A jury's finding by special interrogatory is reviewed under the sufficiency of the evidence standard." State v. Stubbs, 170 Wn.2d 117, 123, 240 P.3d 143 (2010). "A claim of insufficiency admits the truth of the State's evidence and all inferences that can reasonably be drawn from it." State v. DeVries, 149 Wn.2d 842, 849, 72 P.3d 748 (2003). We defer to the trier of fact in matters of conflicting testimony, witness credibility, and its view of the persuasiveness of the evidence. State v. Trout, 125 Wn. App. 403, 409, 105 P.3d 69 (2005).

RCW 9.94A.535(3) lists aggravating factors that can support a departure from the sentencing guidelines if the "facts supporting aggravating circumstances" can be "proved to a jury beyond a reasonable doubt." One such factor is if "[t[he victim's injuries substantially exceed the level of bodily harm necessary to satisfy the elements of the offense." To impose an exceptional sentence on this basis, the court must be satisfied that the facts found by the jury are "substantial and compelling reasons justifying an exceptional sentence." RCW 9.94A.537(6); State v. Sage, 1 Wn. App. 2d 685, 709, 407 P.3d 359 (2017).

---

[1] Knoth's standard range sentence was 3 to 9 months.

In making this determination, the trier of fact must compare the actual injuries against the minimum injury that would satisfy the definition of the charged crime. State v. Pappas, 176 Wn.2d 188, 192, 289 P.3d 364 (2012). "Such a leap is best understood as the jump from 'bodily harm' to 'substantial bodily harm,' or from 'substantial bodily harm' to 'great bodily harm.'" Stubbs, 170 Wn.2d at 130. "Thus, the statute requires only that the injuries 'substantially exceed,' rather than a requirement to meet a higher category of harm." State v. Duncalf, 177 Wn.2d 289, 296, 300 P.3d 352 (2013) (quoting Pappas, 176 Wn.2d at 193).

As charged here, a person is guilty of assault in the second degree if they "intentionally assault[ed] another and thereby recklessly inflicted substantial bodily harm." RCW 9A.36.021(1)(a). RCW 9A.04.110(4)(b) defines "substantial bodily harm" as "bodily injury which involves a temporary but substantial disfigurement, or which causes a temporary but substantial loss or impairment of the function of any bodily part or organ, or which causes a fracture of any bodily part."

The court instructed the jury that proof of "great bodily harm" would satisfy the statutory aggravator. Under RCW 9A.04.110(4)(c), "great bodily harm" means "bodily injury which creates a probability of death, or which causes significant serious permanent disfigurement, or which causes a significant permanent loss or impairment of the function of any bodily part or organ."

Although the State was not required to prove that Schmidt's injuries reached this higher category of harm, we conclude that the State presented sufficient evidence to satisfy this requirement, thereby necessarily exceeding the standard for substantial bodily harm. Dr. Chesnut testified that Schmidt presented with "a bad lesion" and

5

"bruises in the cerebellum" necessitating emergency surgery to relieve swelling by opening the skull. Dr. Chesnut recalled observing "a lot of swelling" on Schmidt's brain during surgery. He explained that any swelling in that area can be "catastrophic" because it "compresses the brain stem which is what runs breathing and helps control the cardiac rhythms." Dr. Chesnut specified that without surgical intervention, the likely outcome of that swelling would be "quite possibly death." Dr. Chesnut said that Schmidt also suffered an orbitozygomatic fracture to the cheek bone near his right eye.

Schmidt testified that since the assault, his "[l]eft side is slower" and he has problems with "speech and memory." He can no longer button his shirt and has ongoing problems with balance and equilibrium. He lost his job because he "couldn't think enough" and is now on Social Security Disability. And he had to quit hiking and volunteering for Search and Rescue. And Halbert testified that since the accident, Schmidt "just doesn't have the same full functionality that he had before," such as "limited physical mobility" and "slower speech."

Knoth argues that the State did not prove "great bodily harm" because there was no evidence Schmidt suffered "significant serious permanent disfigurement" such as facial lacerations or a knife entrance wound. But this is only one of three alternative means by which the State may establish "great bodily harm." Given that the State provided substantial evidence that Schmidt suffered a "probability of death" or "significant permanent loss or impairment of the function of any bodily part or organ," the lack of disfigurement is of no consequence.

Knoth also argues that the State failed to prove "great bodily harm" because it did not prove Schmidt suffered "permanent" loss or impairment of bodily functions. But

6

Schmidt's and Halbert's testimony at trial, which occurred more than two years after the assault, indicates that Schmidt continues to suffer significant problems with balance, equilibrium, speech, and memory and that these limitations prevent him from working or engaging in certain activities he once enjoyed. And Dr. Chesnut testified that it would not be surprising to find lifelong injuries as a result of Schmidt's injuries.

The evidence plainly exceeds the "temporary but substantial loss or impairment of the function of any bodily part or organ" standard necessary to prove substantial bodily harm. The evidence also meets the "probability of death" or "significant permanent loss or impairment of the function of any bodily part or organ" necessary to prove great bodily harm. The trial court was authorized to impose an exceptional sentence.

III.

Knoth next seeks to strike the $200 criminal filing fee from the judgment and sentence. The State concedes that, while this legal financial obligation was properly imposed at the time of sentencing, it should be stricken pursuant to recently amended RCW 36.18.020(2)(h)(criminal filing fee) and State v. Ramirez, 191 Wn.2d 732, 426, P.3d 714 (2018). We accept the State's concession and agree.

IV.

Knoth raises two additional issues in his pro se statement of additional grounds (SAG) pursuant to RAP 10.10. Neither issue has merit.

First, Knoth argues that the court failed to consider as a mitigating circumstance that the victim was the initiator and provoker of the incident. On this basis, he contends that the aggravating factor was not proven and that the jury was not properly instructed.

As discussed above, the evidence was sufficient to support the conviction. Regarding the alleged instructional error, "[j]ury instructions are sufficient when they allow counsel to argue their theory of the case, are not misleading, and when read as a whole properly inform the trier of fact of the applicable law." State v. Knutz, 161 Wn. App. 395, 403, 253 P.3d 437 (2011) (quoting State v. Aguire, 168 Wn.2d 350, 363-64, 229 P.3d 669 (2010)). The instructions allowed defense counsel to present evidence that Schmidt instigated the incident by approaching the group and making offensive comments.

Second, Knoth claims his right to a fair trial was violated when the State amended the charge two days before trial from assault in the first degree to assault in the second degree with an aggravating factor, thereby forcing him to stand trial with an attorney who was unprepared. Under CrR 8.3(b), the court may "in the furtherance of justice . . . dismiss any criminal prosecution due to arbitrary action or governmental misconduct when there has been prejudice to the rights of the accused which materially affect the accused's right to a fair trial." Prejudice includes the denial of the right to effective assistance of counsel who has had adequate opportunity to prepare a defense. State v. Michielli, 132 Wn.2d 229, 240, 937 P.2d 587 (1997). Here, the record shows that defense counsel affirmatively declined to object to the amended information. There is no showing of prejudice.

We remand to the trial court to strike the $200 criminal filing fee. We otherwise affirm Knoth's conviction and sentence.

No. 78760-8-I/9

_____

Mann, ACJ

WE CONCUR:

_____      _____

9